**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | | |
|---|---|---|
| **CHESTER BARRETT**, | ) | |
| *individually, and on behalf of all* | ) | |
| *other similarly situated,* | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 4:17-cv-215** |
| | ) | |
| **UNITED INSURANCE COMPANY** | ) | |
| **OF AMERICA** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

**COMES NOW,** Chester Barrett, Plaintiff in the above-styled action, and files this Complaint, individually, and on behalf of all others similarly situated, against United Insurance Company of America, Inc., and Kemper Corporation, showing this Honorable Court as follows:

## I. JURISDICTIONAL ALLEGATIONS

1. Plaintiff Chester Barrett was a citizen and resident of Liberty County, Georgia.[1]

2. Defendant United Insurance Company of America ("United"), is an Illinois corporation which conducts substantial business in the State of Georgia.

3. Defendant United can be served with process at its home office and principal place of business located at One East Wacker Drive, Chicago, Cook County, Illinois 60601.

4. A substantial number of events or omissions which give right to Chester Barrett's and Class

---

[1] Plaintiff Chester Barrett passed away at the age of 97 on August 3, 2018. (See Exhibit A, Georgia Death Certificate.) Contemporaneously herewith, Plaintiff is filing a Motion to Substitute.

Page 1 of  22

Members' claims took place in the State of Georgia, specifically in the Southern District of Georgia.

5. At all times relevant to this cause of action, United has continuously and systematically conducted business on a regular basis in the State of Georgia, including the Southern District of Georgia, and has purposely availed itself of the privileges and benefits of doing business in Georgia, especially the Southern District of Georgia.

6. This Court may exercise it jurisdiction over the parties and subject matter of this action pursuant to O.C.G.A. § 9-10-91, as United transacts and has transacted business in the State of Georgia, including the Southern District of Georgia, and has committed tortious activity, among other acts, withing the State of Georgia, including, but not limited to, the Southern District of Georgia.

7. Venue if proper in this Honorable Court.

## II. FACTUAL ALLEGATIONS

8. This is a consumer class action seeking redress and injunctive relief for a fraudulent scheme and common course of conduct involving clear racial discrimination, uniformly deceptive sales practices, unconscionable conduct, fraud and deception by United relating to both the training of its agents and the marketing, sale and administration of the Policies.

9. This action is brought by Chester Barrett as a class action on behalf of all persons who have (or had at the time of the policy's termination) an ownership interest in: (1) one or more Policies, and/or Industrial Policies, serviced or administered by United that were in force on or after January 1, 1970 and for which United charged African-Americans premiums that were higher than the premiums it charged similarly situated Caucasians, (hereinafter the "Class" or "Class Members").

10. Chester Barrett seeks injunctive, declaratory and equitable relief, compensatory damages and other remedies for United's unlawful, unconscionable and racially discriminatory conduct in connection with the training of its agents and marketing, sale and administration of Policies sold to Chester Barrett and the Class.

11. Industrial Life Policies and similar Policies sold by United are life insurance products, generally designated as "Industrial Life" on their face, having a relatively low face value which is typically between one thousand dollars ($1,000) and five thousand dollars ($5,000), and premium payments which are designed to appear to the policyholder to be relatively modest.[2] These premiums have historically been collected on a weekly, bi-weekly, or monthly basis. The historical collection practice of these policies was conducted by United agents who would visit the policyholders in person, a practice known in the industry as servicing the policies on a "debt basis" or "home service."

12. Plaintiff Chester Barrett purchased a Policy from United on or around December 18, 1984. ("Barrett Policy"). (See Exhibit B.) The Barrett Policy had a face value of $5,000.00 and was designated as a "WHOLE LIFE" policy, though its characteristics mirrored the Industrial Policies sold by United.

13. As part of its nationwide scheme, United targeted low income, unsophisticated and minority segments of the population, especially in the Southeastern United States, including Chester Barrett, and developed insurance products for sale to these consumers.

---

[2] Plaintiff notes that the Barrett Policy does not fall under the statutory definition of "Industrial Life Insurance" as defined by O.C.G.A. § 33-26-1. However, the Barrett Policy shares the characteristics of an Industrial Life Insurance policy as defined by O.C.G.A. § 33-26-1. However, the Barrett Policy may still expressly violate Georgia law pursuant to O.C.G.A. § 33-26-6.2(a) and (b). Chester Barrett contends that many Class Member Policies sold by United expressly violate the terms of O.C.G.A. § 33-26-6.2(a) and (b).

14. United marketed and serviced the Policies through agents who were given exclusive territories known as "debit routes." United agents were trained to personally visit the homes of Class Members, such as Chester Barrett, residing on their routes to collect the premiums and develop a personal relationship with the Class Members that would facilitate the sale of additional Policies in the future.

15. For many years, United, pursuant to its own practices and procedures, routinely, knowingly, and intentionally charged African-American individuals, including Chester Barrett, more for the Policies than it charged similarly situated Causcasians.

16. In the early years of the scheme, United issued rate books to its agents which established overly discriminatory rates for "negro" or "colored" risks, as opposed to "white" risks.

17. Later, United issued rate books by which African-Americans were charged higher "substandard" or "standard" rates while Caucasians were charged lower "preferred" rates.

18. More recently, United issued rate books which utilized so-called "socio-economic" underwriting without explicitly asking for the insured's race.

19. African-Americans, including Chester Barrett and Class Members, were assigned to less favorable underwriting classifications and consequently paid higher premiums based on, among other things, their employment in occupations traditionally held by African-Americans and subjective and prejudicial classifications bearing no legitimate relationship to the actual mortality risk of African-American Class Members, including Chester Barrett. These discriminatory practices were pervasive and systematic.

20. After United ceased its discriminatory underwriting and classification practices, African-Americans, including Chester Barrett, who had purchased Policies with race-based premiums

continued to pay higher premiums established under United's prior discriminatory pricing practices.

21. Plaintiff Chester Barrett continued paying premiums on the Barrett Policy throughout the length of his life up and until his death on August 3, 2018.

22. United also, as part of its routine practices and procedures, prohibited its agents from selling ordinary life insurance policies and products to African-Americans. United was motivated by discriminatory intent and continues to discriminate against African-Americans today, including Chester Barrett and Class Members, as described, *infra*.

23. United's Policies, including Industrial Polices and Policies mirroring Industrial Policies, targeted consumers who were unsophisticated with respect to insurance and economically vulnerable. In designing, marketing, and selling these policies, United knew that it was targeting a disadvantaged segment of the population, one unsophisticated with respect to insurance and related financial dealings or affairs and ill-equipped to comprehend the technical language of insurance policies or the complex and sophisticated methods of underwriting and premium computations.

24. United knew that to the prospective consumers and current policyholders, including Chester Barrett and Class Members, the premiums appeared small and affordable, and that the Policy death benefits appeared significant.

25. United knew, but never disclosed to Class Members, including Chester Barrett, that over the normal life expectancy of the Class Members, the small premiums would often far exceed the face value of the Policies.

26. In fact, Chester Barrett paid United well over the face value of the policy during his life. As of

August, 2018, Mr. Barrett had paid roughly $14,649.05 for the Barrett Policy which had a face value of $5,000.00. In other words, Mr. Barrett paid almost triple the face value of his policy over a period of over thirty-three (33) years.

27.  The Policies, including the Barrett Policy, were intentionally designed by United to create the illusion that they would provide valuable yet affordable death benefits. In reality, United's Policies were unconscionable products calculated to generate substantial profits from United and commissions to its agents. In essence, the  Policies had minimal and ever-declining value to the insured, such as Chester Barrett, if the insured lived a long life.

28. United's Policies, by design, accrued little to no cash value for the benefit of Chester Barrett and Class Members. As opposed to participating traditional whole life policies, Class Members did not receive returns of premium overpayments, when, as United knew in designing and pricing the Policies, including the Barrett Policy, that its experience factors were more favorable than assumed.

29.  Additionally, unlike traditional participating whole life policies, the United Policies, including the Barrett Policy, did not provide increasing death benefits over the duration of the policies, nor, in many instances, did the Policies endow by a date certain within the reasonably expected lifetime of the insured. Furthermore, the premiums charged by United were inflated in relation to the minimal death benefits actually afforded to Chester Barrett and Class Members and the risk costs to United.

30. United knew that Chester Barrett and Class Members would often pay premiums over their anticipated life expectancy that would far exceed the face value of the Policies. Chester Barrett did, in fact, pay almost triple the face value of his policy over the course of his ownership of the

Barrett Policy.

31.  The Policies, including their unsuspectedly high premium charges, minimal to non-existent increasing death benefits, anticipated mortality experience and low guaranteed interest rates, by United's design failed to transfer any risk to United and that any minimal risk would evaporate over the duration of the policies. United knew and expected that it would profit's would grow as its risk vanished.

32. As the United Polices, including the Barrett Policy, do not accrue significant cash values and do not provide increasing death benefits, they have little to no value to Class Members, and had little to no value to Chester Barrett, once the premiums paid exceed the death benefit, or upon termination. Consequently, Class Members, such as Chester Barrett, are required to continue making premium payments after the premiums exceed the face value of the policies or face losing all of their paid premiums without receiving any meaningful or reasonable cash value or death benefits.

33.  The nature of the Policies was furthered by the manner by which United marketed the Policies and trained its agents to sell and administer Policies such as the Barrett Policy. Upon information and belief, United performed no underwriting on prospective policy holders, as the Policies had small face values. As opposed to selling Class Members affordable versions of traditional life insurance products, which, of course, would have required legitimate underwriting, but which also would have accrued real cash values for a proportionally lower per unit premium charge.

34. United, in furtherance of its clandestine and fraudulent scheme and course of conduct, deceived and induced Chester Barrett and Class Members to purchase the above-referenced Policies by preparing, approving and dispersing–both by itself and through its agents–false and misleading

information and sales materials containing numerous misrepresentations and omissions to Chester Barrett and Class Members.

35. United attempted to deprive Class Members of Policy benefits to which Class Members were entitled through the methods employed to administer the Policies. The Policies were designed to include non-forfeiture options, which included the existence of a cash value as well as options referred to as "paid up insurance" and "extended term." In the event of policy lapse for non-payment of premiums, United concealed the existence of cash value from its policyholders and to use the cash value to pay premiums until any and all of the Policy is completely depleted. United encouraged and trained its agents to, in the event of lapse, persuade its customers to purchase new policies to replace lapsed Policies rather than to reinstate the lapsed policies, which had remaining cash value. The remaining cash value was forfeited to United.

36. United has often failed to pay Policy benefits, including death and endowment benefits, that were due to policyholders under the Policies and Industrial Polices. United has known that due to the combination of its own defective record keeping practices and the vulnerable nature of its policyholders, including Chester Barrett, that these debit policyholders and their beneficiaries are not likely to discover that their premiums had been misapplied or converted, or that their debit life policies had lapsed or that policy death benefits were due to them.

37. On those occasions when aggrieved policyholders, or their beneficiaries have discovered such facts, United has denied coverage and/or refused to pay policy benefits, knowing that Class Members would be unable to prove that they had paid required premiums or that their debit life policies were still in force. United has improperly received millions of dollars in premiums and unpaid death and endowment benefits by virtue of its fraudulent and deceptive policy

administration practices.

38.   United has failed to pay all of the insurance proceeds to the beneficiaries of insureds after they had received notice of the death of the insured. In other instances, United failed to notice owners of insurance proceeds who were entitled to notice pursuant to the laws of the states which have adopted unclaimed property acts.

39.   United also failed to establish record keeping systems or policies and procedures to effectively administer the Policies. To reduce administration expenses and to lower claim payments, United intentionally failed to monitor the payment status of Class Members' accounts, failed to accurately record or account for premium payments received from Class Members, failed to provide Class Members with the proper and required notice of non-payment of premiums before forfeiture, and failed to establish adequate systems to locate, notify or pay beneficiaries, Class Members' estates or others who were entitled to receive death benefits under the debit life polcies.

40.   As a result, United wilfully, intentionally, deceptively and wrongfully caused or encouraged the lapse of many Policies by failing to properly credit premium payments, improperly altering established premium collection procedures, otherwise hindering the payment of premiums by Class Members and failing to provide them with proper notice of non-payment of premiums as required under the policies.

41.   United's plan, scheme, and course of conduct was designed to and did induce thousands of Class Members to purchase Policies from United. Chester Barrett and Class Members have lost and/or face losing millions of dollars in premiums paid which exceed a reasonable or appropriate total of premiums which should have been paid for their Policies.

42. United's sales practices have been lucrative, and have earned United many millions of dollars of premium income in excess of the face value of the policies, such as the Barrett Policy, or in excess of a reasonable or appropriate total of premiums which should have been paid for the Policies which were sold to the unsuspecting Class Members, including Chester Barrett, based upon the deceptive and unconscionable scheme and conducted, *supra*.

### III. FRAUDULENT CONCEALMENT AND TOLLING

43. Throughout the Class Period, United affirmatively and actively concealed its fraudulent design, marketing and administration of its industrial policies, as well as its racially discriminatory pricing and Policy sales and administration scheme from Chester Barrett and Class Members.

44. This fraudulent concealment began at the time the Barrett Policy was sold to Chester Barrett, as well as when Policies were sold to Class Members and continued throughout the Class Period.

45. Despite exercising reasonable diligence and continuing to pay his monthly premium, Chester Barrett could not discover, was prevented from discovering, and did not have any of the facts which might have led to the discovery of United's chicanery.

46. United knew and relied on Chester Barrett's, as well as other Class Members' lack of sophistication to pursue its racially discriminatory practices and its harmful and fraudulently designed and priced Policies.

47. In an effort to keep Chester Barrett, as well as other Class Members from discovering its racial discrimination and its fraudulent Policy design, marketing and administration practices, United engaged in a systematic effort to take records from Class Members and has systematically engaged in conduct designed to eliminate and confuse the administrative records of Class Members, including Chester Barrett.

48. United has also engaged in the practice of concealing its rating structure, if such structure remains in existence, from Chester Barrett and Class Members and has further concealed its racial discrimination through use of pretextual, facially neutral rating classifications.

49. United has uniformly refused to provide accurate policy information to Class Members upon request.

50. The running of the statute of limitations has been suspended with respect to any claims which Chester Barrett or other Class Members have brought or could bring as a result of the unlawful and fraudulent concealment and course of conduct described herein.

51. In addition, Chester Barrett and the Class did not and could not have discovered their causes of action until the time noted below, thereby, tolling the statute of limitations. United, through numerous methods of concealment and obtuse practices, affirmatively and fraudulently concealed the existence of its racial discrimination as well as its unlawful product design, marketing and administration scheme and course of conduct from Chester Barrett and Class Members.

52. Chester Barrett and class Members had no knowledge of United's scheme and unlawful conduct and either did not learn of, or did not learn the extent of, United's fraudulent course of conduct until the filing of this action.

## IV. CLASS ACTION ALLEGATIONS

53. This case is brought as a class action pursuant to O.C.G.A. § 9-11-23 and Rule 23 of the Federal Rules of Civil Procedure. Chester Barrett seeks certification of this action as a class action on behalf of all persons who have, or had at the time of the policy's termination, an ownership interest in: (1) one or more Policies or Industrial Policies, serviced or administered by United that

were in force on or after January 1, 1970 and for which United charged African-Americans higher premiums that the premiums it charged to similarly situated Caucasians; and/or (2) one or more facially non-discriminatory Polices and/or Industrial Policies issued, serviced or administered by United that were in force on or after January 1, 1988 (the "Class" or "Class Members"). This case is properly brought as a class action under O.C.G.A. § 9-11-23 and Rule 23, for the reasons set forth in the subsequent paragraphs.

54.   This action is appropriate as a class action pursuant to Rule 23, since Chester Barrett seeks injunctive relief and corresponding declaratory relief for the entire Class, the prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for United. Additionally, adjudications with respect to individual Class Members would be dispositive of the interests of other Class Members who are not parties to the adjudication and may impair or impede their ability to protect their interests.

55. Chester Barrett reasonably estimate that the Class includes thousands of Class Members, based on the number of Policies issued and outstanding in Georgia by United during the Class Period. It is substantially difficult, inconvenient and impractical to join every proposed Class Member as parties to this action. The identity of Class Members is, or should be, known to United through its company records.

56. Each member of the proposed Class has an interest in the same issues of law and the same issues of fact raised by Chester Barrett's allegations, which predominate over any issues affecting only individual Class Members. The numerous and substantial questions of law and fact common to all Class Members include:

a.  Whether United engaged in systematic courses of business which acted to deceive or mislead Chester Barrett and Class Members and/or to exact from Chester Barrett and Class Members an unreasonable price for its Policies by exploiting its position of superior knowledge;

b.  Whether United discriminated against Class Members by charging them higher premiums for Policies than it charged similarly situated Caucasians;

c.  Whether United discontinued any such discriminatory premium pricing procedures and practices but continued to charge discriminatory rates to Chester Barrett and the Class;

d.  Whether United discriminated against Chester Barrett and Class Members by offering only substandard insurance products to African-Americans;

e.  Whether United discriminated against Chester Barrett and Class Members by unilaterally altering the debit system of collection and by failing to provide a premium rebate or reduction to reflect United's improvements in experience factors for the Policies;

f.  Whether United routinely engaged in fraudulent and deceptive acts and practices and courses of business in the sale of its Policies and otherwise took unfair advantage of its position relative to Chester Barrett and the Class;

g.  Whether United routinely failed to disclose to Chester Barrett and Class Members material information pertaining to the Policies such as the actuarial basis on which premiums would be calculated and the likelihood that, during the Class Members' normal life expectancy premium payments would exceed the face value of the policies or a reasonable amount of total premiums;

h.  Whether United failed to supervise or train its agents, actuaries and other employees who engaged in the schemes described herein and failed to prevent its agents from violating

applicable state laws and regulations;

i.  Whether United breached its contracts with Plaintiffs and Class Members by refusing or purposely failing to credit premium payments to the Policies in an effort to cause such policies to lapse;

j.  Whether Chester Barrett and Class Members have sustained damages, whether those damages can be properly calculated on a class-wide basis, and if so, the proper measure of such damages;

k.  Whether Chester Barrett and Class Members are entitled to specific performance, injunctive relief, or other equitable remedies against United; and

l.  Whether Chester Barrett and Class Members are entitled to an award of punitive damages against United.

57.  As victims of United's alleged wrongdoing, Chester Barrett has a genuine and legitimate personal interest in the outcome of this action, typical of other Class Members.

58.  Chester Barrett will adequately and thoroughly represent the interests of all members of the proposed Class, and Chester Barrett has retained legal counsel experienced in class action litigation and willing to advance necessary costs to prosecute such litigation.

59. There is no conflict of interest between Chester Barrett and any other member of the proposed Class.

60. Chester Barrett and his counsel have the resources, willingness, and ability to give the best notice practicable under the circumstances of this class action to members of the proposed Class, in the form and manner prescribed in this Court's discretion.

61. A class action is superior to other available methods for the fair and efficient adjudication of this

matter. Absent a class action, Class Members will continue to suffer damage and United's violations of law will proceed without remedy while United continues to reap the proceeds of its disgraceful conduct.

62.  Most individual Class Members lack the ability to pursue individual actions due to both the complexity of the issues involved and the significant costs pursuing said claim. Further, each claim individual claim for damages is small–though significant.

63.  Certification of this action will result in an orderly and expeditious administration of Class claims. Certification will save time, effort and expense and will also permit uniformity of decisions.

64.  This action presents no difficulty that would impede its management by the Court as a class action and a class action is superior to other available methods for the fair and efficient adjudication of their claims. The benefit of class certification outweighs any inefficiencies or other disadvantages that may result from certification.

65.  Chester Barrett seeks preliminary and permanent injunctive relied and equitable relief on behalf of the entire Class, on grounds applicable to the entire Class, to require United to reform or to specifically perform the Policies as represented and to disgorge all premium overcharges in excess of the actuarially proper rate for the cost of the death benefit and other values provided by the policies and for premium overcharges based upon racially discriminatory premium pricing.

## COUNT I

### *Violation of Civil Rights Pursuant to 42 U.S.C. § 1981*

66. Chester Barrett incorporates by reference each and every allegation of all preceding paragraphs

as if fully alleged herein.

67. United intentionally discriminated against African-American Class Members, including Chester Barrett, by charging African-Americans, including Chester Barrett, higher premiums than those charged to similarly situated Caucasian policyholders, and by prohibiting its agents from selling participating whole life insurance products to African-Americans.

68. By charging Chester Barrett and other similarly situated African-Americans higher premiums and refusing to offer participating whole life products to Chester Barrett and other similarly situated African-Americans, United violated the rights of Chester Barrett and other African-American Class Members to make and enforce contracts on the same terms as Caucasian policyholders.

69. United's actions violated and continue to violate 42 U.S.C. § 1981, as well as the rights of African-American Class Members under the Fifth, Thirteenth and Fourteenth Amendments to the United States Constitution.

70. United has damaged Chester Barret and African-American Class Members who have suffered economic loss as a result of being overcharged by United as a result of United's illegal racial discrimination.

## COUNT II

### *Money Had and Received*

71. Chester Barrett incorporates by reference each and every allegation of all preceding paragraphs as if fully restated herein.

72. United has charged and received premiums from Chester Barrett and Class Members which are excessive, unconscionable, and in many cases, unlawful.

73. United has also failed to pay and has held insurance proceeds to which certain Class Members are entitled.

74. At all times relevant to these transactions, United held superior knowledge and bargaining powers, and Chester Barrett and Class Members had and continue to have no meaningful avenue or ability to negotiate the terms of insurance agreements.

75. United collected excessive and unconscionable premiums from Chester Barrett through fraud, deception and coercion.

76. Chester Barrett and Class Members are entitled to equitable relief due to the aforementioned practices, and United should not be permitted to retain said funds.

77. Pursuant to United's aforementioned course of conduct, Chester Barrett and Class Members have been damaged and seek immediate return of all premiums paid which were racially discriminatory; immediate payment of all insurance benefits rightfully owed to them by United; and seek to reform the underlying contracts and consolidate any multiple Policies and reform the applicable premiums and/or death benefits to eliminate the effects of United's discriminatory conduct.

## COUNT III

### *Declaratory and Injunctive Relief*

78. Chester Barrett incorporates by reference each and every allegation of all preceding paragraphs as if fully restated herein.

79. United, through its agents, is permitted by law to establish rates and collect premiums only if said rates and premiums are not excessive or unreasonable or racially discriminatory.

80. Chester Barrett, for himself and on behalf of the Class, seeks injunctive relief enjoining United

from collecting premium payment on any Policy where the premiums paid are discriminatory, excessive or unconscionable. Chester Barrett also seeks return of all premiums paid on his policy, with interest. Chester Barrett further seeks a mandatory injunction requiring United to treat any Policy for which premiums paid exceed the amount actuarially reasonable as a paid up Policy to disgorge any and all excessive premium payments made by Chester Barrett and Class Members; and to provide such other relief as is just and proper.

81. Chester Barrett and Class Members have no adequate remedy at law.

82. Pursuant to the above allegations, Chester Barrett and Class Members are entitled to declaratory judgment and injunctive relief as set forth, *supra*.

## COUNT IV

### *Breach of Contract*

83. Chester Barrett incorporates by reference each and every allegation of all preceding paragraphs as if fully restated herein.

84. As a material part of the insurance agreement between United and Chester Barrett and other Class Members, either through the express terms of the contract, the applicable statutory provisions or the course of dealing between the parties, from the outset of certain Policy's premium payments were collected by "debit" agents for United on a weekly, bi-weekly, or monthly basis. Additionally, Policy benefits are due upon death or maturity under the express terms of the Policies.

85. United has failed to maintain premium records and other records in accordance with its obligations under the Policies. In addition, United has systematically failed to pay death benefits to beneficiaries and policyholders when those benefits are due under the Policies and has failed

to properly deliver such unpaid proceeds to the State authorities.

86. United has materially breached the terms of its agreements with Class Members through its course of conduct over a period of years.

87. As a result of United's breaches, Class Members have suffered economic damages in that Policy benefits have not been paid, premium payments have not been correctly credited and Policies have improperly lapsed and there has been no premium credit for these direct payments.

## COUNT V

### *Fraudulent Inducement*

88. Chester Barrett incorporates by reference each and every allegation of all preceding paragraphs as if fully restated herein.

89. United made affirmative representations to Chester Barrett that the Barrett Policy was a legitimate "whole life" insurance policy with a valuable death benefit.

90. At that same time, United concealed material facts from Chester Barrett. Chester Barrett purchased the Barrett Policy on December 18, 1984 at the age of 64. United failed to inform Chester Barrett that if he lived for eleven (11) years and five (5) months, he would have paid premiums in excess of his death benefit.

91. In fact, Chester Barrett lived for almost thirty-four years from the date of his purchase of the Barrett Policy, and United never informed, nor planned to inform him that he had paid well in excess of the death benefit of the Barrett Policy.

92. At the times United made the false representations to Chester Barrett that he was purchasing an valuable whole life insurance policy, United knew that the representations were false or made this representation without knowing the truth or falsity of such reprensentations.

93. United made similar representations to Class Members.

94. United made such false representations to induce Chester Barrett and Class Members to rely on said false representations and omissions in order to sell a greater number of Policies.

95. As a direct and proximate result of Chester Barrett's and Class Members' justifiable reliance on the affirmative misrepresentations and omitted material facts, Chester Barrett and Class Members have suffered monetary and other damages.

## COUNT VI

### *Negligent Misrepresentation*

96. Chester Barrett incorporates by reference each and every allegation of all preceding paragraphs as if fully restated herein.

97. As set forth above, United made affirmative misrepresentations to Chester Barrett and Class Members and concealed material facts from Chester Barrett and Class Members.

98. At the time said misrepresentations were made, United knew or should have known that the representations were false, or made or caused to be made such representations without knowledge of the truth or falsity of such representations.

99. United made the misrepresentations in order to induce Chester Barrett and Class Members tyo rely on the misrepresentations. Chester Barrett and Class Members reasonably and justifiably relied on the misrepresentations and omitted material facts, Chester Barrett and Class Members have suffered monetary damages and other damages.

## COUNT VI

### *Punitive Damages*

100.    Chester Barrett incorporates by reference each and every allegation of all preceding

paragraphs as if fully restated herein.

101. The acts and omissions of United set forth above show willful misconduct, wantonness, and/or the entire want of care which would raise the presumption of conscious indifference to the consequences.

102. The acts and omissions of United demonstrate a specific intent to harm Chester Barrett and Class Members.

**WHEREFORE,** Chester Barrett demands judgment against United for himself and Class Members as follows:

(A) An order determining that the action is a proper class action pursuant to Fed. R. Civ. P. 23;

(B) Awarding Plaintiff and the Class compensatory damages in an amount to be proved at trial for the wrongful acts complained of;

(C) Awarding Plaintiff and the Class their costs and disbursements incurred in connection with the action, including reasonable attorney's fees, expert witness fees and other costs;

(D) Granting extraordinary equitable and/or injunctive relief as permitted by law or equity, including attaching, impounding or imposing a constructive trust upon, or otherwise restricting, the proceeds of United's ill-gotten funds to ensure Plaintiff and Class Members have an effective remedy;

(E) Granting declaratory and injunctive relief;

(F) Granting such other and further relief as the Court deems just and proper including but not limited to recissionary relief and reformation;

(G) A trial by a jury composed of twelve (12) persons;

(H)    An award of punitive damages;

This, the 23rd day of January, 2019.


                                    /s/ Robert Bartley Turner
                                    Robert Bartley Turner
                                    Georgia Bar No: 006440
                                    William J. Degenhart
                                    Georgia Bar No. 384018
                                    *Attorneys for Plaintiffs*


SAVAGE, TURNER, DURHAM,
PINCKNEY & SAVAGE
102 East Liberty Street, 8th Floor
Savannah, Georgia  31401
(912) 231-1140