**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

MINERVA BARRETT, executrix of the estate
of Chester Barrett, and on behalf of all others
similarly situated,

        Plaintiff,

    v.

UNITED INSURANCE COMPANY OF
AMERICA, INC.,

        Defendant.

CIVIL ACTION NO.: 4:17-cv-215

## O R D E R

In this putative class action lawsuit, Plaintiff, the executrix of the estate of Chester Barrett, brings claims arising out of a life insurance policy Mr. Barrett purchased from Defendant United Insurance Company of America, Inc. ("United") on December 18, 1984. The thrust of Plaintiff's claims is that United used racially discriminatory practices in selling life insurance policies to Mr. Barrett and other African-Americans. Specifically, she contends that United charged Mr. Barrett a higher premium for the policy than United charged white customers and sold him an inferior product than those available to white customers. (Doc. 29.) This matter is before the Court on United's Motion to Dismiss Plaintiff's Amended Complaint. (Doc. 34.) In this Motion, Defendant advances numerous arguments in support of its position that Plaintiff's Amended Complaint should be dismissed. United argues that all of Plaintiff's claims are barred by the statute of limitations. Additionally, United attacks Plaintiff's standing to bring certain claims, and it contends that Plaintiff's state law allegations fail to state a claim upon which this Court can grant relief.

For the reasons set forth below, the **GRANTS IN PART** and **DENIES IN PART** United's Motion to Dismiss, (doc. 34). The Court **GRANTS** United's Motion to Dismiss for lack of standing as to Plaintiff's claims that United failed to keep accurate records, allowed policies to lapse, and failed to pay death benefits. However, the Court **DENIES** United's Motion to Dismiss for lack of standing as to all other claims. The Court also **GRANTS** United's Motion to Dismiss for untimeliness as to Plaintiff's claims that Mr. Barrett paid premiums exceeding the face value of his policy. However, the Court **DENIES WITHOUT PREJUDICE** United's Motion to Dismiss for untimeliness as to all other claims. Further, the Court **DENIES** United's Motion to Dismiss for failure to state a claim as to Plaintiff's claims for money had and received, negligent misrepresentation, fraudulent inducement, and punitive damages. The Court **GRANTS AS UNOPPOSED** United's Motion to Dismiss for failure to state a claim as to Plaintiff's claims for breach of contract, declaratory relief, and injunctive relief. Additionally, for the reasons stated below, the Court **STAYS** all proceedings and deadlines in this case until further order of the Court and **DIRECTS** the parties to each file a status report with the Court within **twenty-one days** of the date of this Order.

## BACKGROUND[1]

Chester Barrett, a now-deceased African-American man, was a resident of Liberty County, Georgia. (Doc. 29 at p. 1.) Defendant United is an Illinois insurance entity that conducts business throughout the United States, including in Georgia. (Id.) Mr. Barrett purchased a life insurance policy from United on December 18, 1984. (Id. at p. 3.) That transaction and policy form the basis of this lawsuit. Mr. Barrett's policy had a face value of $5,000 and was designated as a

---

[1] The Court takes the following facts from Plaintiff's Amended Complaint, (doc. 29), and assumes them to be true, as it must at this stage.

"WHOLE LIFE" policy "though its characteristics mirrored the Industrial Polices sold by United." (Id. at p. 3; doc. 29-2.)

Plaintiff brings this putative class action as the executrix of Mr. Barrett's estate. Generally, Plaintiff contends that Mr. Barrett, like others situated similarly to him, purchased an inferior product and paid higher premiums on this insurance policy due to United's unlawful scheme of discrimination against African-Americans. (Id. at pp. 3–8.) "As part of its nationwide scheme, United targeted low income, unsophisticated and minority segments of the population, especially in the Southeastern United States, including Chester Barrett, and developed insurance products for sale to these consumers." (Id. at p. 3.) Through this scheme, United designed and marketed "Industrial Life" insurance policies and policies similar to them.[2] (Id. at p. 3.) These policies have a relatively low face value and their premiums (which are "designed to appear to the policyholder to be relatively modest") are collected, often in person by United agents, on a weekly, bi-weekly, or monthly basis. (Id. at pp. 3–4.) According to Plaintiff, "[f]or many years, United, pursuant to its own practices and procedures, routinely, knowingly, and intentionally charged African-American individuals . . . more for the Policies than it charged similarly situated Caucasians." (Id. at p. 4.) United, with discriminatory intent, took the following actions to carry out this scheme:

- issuing rate books with "overly discriminatory rates" for "negro" or "colored" individuals as opposed to "white" customers;

- issuing rate books charging African-Americans "substandard" or "standard" rates while Caucasians received lower "preferred" rates;

---

[2] Plaintiff concedes that Mr. Barrett's policy does not meet the definition of "Industrial Life Insurance" but contends that the policy "shares the characteristics of an Industrial Life Policy." (Id. at p. 3 n. 2.)

- assigning African-Americans to less favorable underwriting classifications resulting in higher premiums that bore "no legitimate relationship to the actual mortality risk of African-American Class Members, including Chester Barrett";

- utilizing rate books with "so-called 'socio-economic' underwriting without explicitly asking for the insured's race"; and

- establishing "subjective and prejudicial classifications bearing no legitimate relationship to the actual mortality risk of African-American Class Members."

(Id.)

Plaintiff alleges that by targeting this "disadvantaged segment of the population" with "Industrial Polices and Policies mirroring Industrial Policies" (as opposed to ordinary life insurance products), United took advantage of the consumers' alleged lack of sophistication. (Id. at p. 5.) United prohibited its "agents from selling ordinary life insurance products and policies to African-Americans." (Id.) Plaintiff essentially maintains that United tricked African-Americans into buying insurance policies even though these policies were a terrible bargain for the insured, particularly as opposed to traditional insurance policies that United sold to Caucasian customers. (Id. at pp. 5–8.) For instance, Plaintiff contends that the policies:

- required premium payments that, "over the normal life expectancy of Class Members," would greatly exceed the face value of the policy;

- "were intentionally designed by United to create the illusion that they would provide valuable yet affordable death benefits" but in actuality provided "minimal and ever-declining value to the insured";

- did not provide returns on premium overpayments;

- did not provide increasing death benefits over the duration of the policies, unlike traditional whole life policies; and

- were designed to require class members "to continue making premium payments after the premiums exceed the face value of the policies or face losing all of their paid premiums without receiving any meaningful or reasonable cash value or death benefits."

(Id. at pp. 5–7.)  Even after United ceased these intentionally discriminatory practices, African Americans who had purchased policies with race-based premiums, including Mr. Barrett, continued to pay the higher premiums for the inferior policies established under the prior discriminatory pricing scheme.  (Id. at pp. 4–5.)

United peddled these insurance products, including Mr. Barrett's policy, through a targeted marketing scheme.  (Id. at pp. 4–5, 7–8.)  United agents were assigned to "debit routes" and the agents "were trained to personally visit the homes of Class Members, such as Chester Barrett, residing on their routes to collect the premiums and develop a personal relationship with the Class Members that would facilitate the sale of additional Policies in the future."  (Id. at p. 4.)  Further, Plaintiff contends that United induced customers to purchase Industrial Life policies and policies similar to them by "approving and dispersing—both by itself and through its agents—false and misleading information and sales material containing numerous misrepresentations and omissions to Chester Barrett and Class Members."  (Id. at pp. 7–8.)  "As opposed to selling Class Members affordable versions of traditional life insurance products," United performed no underwriting on these policies and instead sold policies with higher premiums and lower cash value than "traditional life insurance products."  (Id. at p. 7.)

Plaintiff further contends that "United affirmatively and actively concealed its fraudulent design, marketing and administration of its industrial policies, as well as its racially discriminatory

pricing and Policy sales and administration scheme from Chester Barrett and Class Members." (Id. at p. 10.) Specifically, United told Mr. Barrett that his life insurance policy "was a legitimate 'whole life' insurance policy with a valuable death benefit." (Id. at p. 19.) Additionally, United "engaged in a systematic effort" to "eliminate and confuse the administrative records of Class Members, including [Mr.] Barrett" in an effort to prevent them from discovering United's racial discrimination. (Id. at p. 10.) Thus, Mr. Barrett "could not discover, was prevented from discovering, and did not have any of the facts which might have led to the discovery of United's chicanery." (Id.) United's discriminatory practices caused Mr. Barrett to purchase an insurance policy and pay approximately $14,649.05 in premiums for the policy. (Id. at p. 13.) The policy carried a death benefit of $5,000. (Id.)

Mr. Barrett filed this lawsuit on September 20, 2017, in the State Court of Liberty County, (doc. 1-1), and United then removed the case to this Court, (doc. 1). Mr. Barrett passed away on August 3, 2018 at the age of ninety-seven. (Doc. 29, p. 1 n. 1.) On December 19, 2018, the Court ruled on several dispositive motions and provided an opportunity to amend the complaint. (Doc. 26.) Plaintiff Minerva Barrett, Executrix of Mr. Barrett's estate, subsequently moved for substitution as the Plaintiff and filed the Amended Complaint. (Docs. 29, 30.) Plaintiff seeks to bring this action on Mr. Barrett's behalf as well as on behalf of a class of others she describes as follows:

> all persons who have, or had at the time of the policy's termination, an ownership interest in: (1) one or more Policies or Industrial Policies, issued, serviced or administered by United that were in force on or after January 1, 1970 and for which United charged African-Americans higher premiums tha[n] the premiums it charged to similarly situated Caucasians; and/or (2) one or more facially non-discriminatory Policies and/or Industrial Policies issued, serviced or administered by United that were in force on or after January 1, 1988.

(Doc. 29, pp. 11–12.) Plaintiff brings claims for: violation of civil rights pursuant to 42 U.S.C. § 1981; money had and received; declaratory and injunctive relief; breach of contract; fraudulent inducement; negligent misrepresentation; and punitive damages. (Id. at pp. 18–21.) Defendant filed the instant Motion to Dismiss all of these claims, (doc. 34), which has now been fully briefed, (docs. 35, 36).

## STANDARD OF REVIEW

Under a Rule 12(b)(6) motion to dismiss, a court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009). "A complaint must state a facially plausible claim for relief, and '[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1215 (11th Cir. 2012) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" does not suffice. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks and citation omitted). While a court must accept all factual allegations in a complaint as true, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. Id.

In this case, in addition to other arguments, United contends that Plaintiff's Amended Complaint should be dismissed as untimely. Dismissal on limitations grounds is only appropriate "if it is apparent from the face of the complaint" that plaintiff's claims are time-barred. Gonsalvez v. Celebrity Cruises Inc., 750 F.3d 1195, 1197 (11th Cir. 2013). "A statute of limitations defense can support dismissal under Rule 12(b)(6) only if it is clear from the face of the complaint that the statute of limitations has run, and it appears beyond doubt that the plaintiff can prove no set of facts that toll the statute." Valencia v. Universal City Studios LLC, No. 1:14–CV–00528–RWS, 2014 WL 7240526, at *3 (N.D. Ga. Dec. 18, 2014) (citations omitted).

## DISCUSSION

### I. United's Motion to Dismiss Plaintiff's Claims for Lack of Standing

United contends that though Plaintiff alleges a "laundry list" of illegal practices committed by United, she fails to plausibly allege that Mr. Barrett suffered any injuries from many of the practices on that list. (Doc. 34, pp. 8–10.) Without an injury in fact, United maintains, Plaintiff has no standing to complain of those practices. (Id.) United argues that Plaintiff only has standing to assert two claims: (1) that Mr. Barrett paid discriminatory premiums; and (2) that he paid premiums that exceeded the face amount of his policy. (Id.)

Article III of the United States Constitution limits the power of federal courts to adjudicating actual "cases" and "controversies." U.S. CONST. art. III, § 2, cl. 1. The most significant case-or-controversy doctrine is the requirement of standing. See Georgia State Conference of NAACP Branches v. Cox, 183 F.3d 1259, 1262 (11th Cir. 1999). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Nat'l All. for the Mentally Ill, St. Johns Inc. v. Bd. of Cty. Comm'rs, 376 F.3d 1292, 1294 (11th Cir. 2004) (quoting Warth v. Seldin, 422 U.S. 490, 498

(1975)).  A plaintiff seeking to invoke federal jurisdiction carries the burden to establish that she

has standing to assert her claim.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

"There are at least three distinct forms of standing: taxpayer standing, individual standing,

and organizational standing."  Nat'l Alliance for the Mentally Ill, 376 F.3d at 1294 (citations

omitted).  To establish standing under any of these forms a plaintiff must satisfy three

requirements: "(1) injury-in-fact; (2) a causal connection between the asserted injury-in-fact and

the challenged action of the defendant; and (3) that the injury will be redressed by a favorable

decision."  Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1328 (11th Cir. 2013) (internal

quotation marks omitted) (quoting Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001)).  To meet

the injury-in-fact requirement, a plaintiff must have suffered an invasion of a legally protected

interest which is: (1) "concrete and particularized," meaning the alleged injury affects the plaintiff

"in a personal and individual way"; and (2) "actual or imminent, not conjectural or hypothetical."

Lujan, 504 U.S. at 560, 560 n. 1 (internal quotation marks and citation omitted).  To be "concrete,"

an injury "must be 'de facto'; that is, it must actually exist."  Spokeo, Inc. v. Robins, 578 U.S. —

—, ——, 136 S. Ct. 1540, 1548 (2016).  A plaintiff may not proceed in federal court without

establishing these three requirements at the outset.  When assessing standing "[a]t the pleading

stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for

on a motion to dismiss we presume that general allegations embrace those specific facts that are

necessary to support the claim."  United States v. Baxter Int'l, Inc., 345 F.3d 866, 881 (11th Cir.

2003) (quoting Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 256 (1994)).

The Court agrees that Plaintiff's Amended Complaint alleges some practices that United

employed generally without any allegation that these practices affected Mr. Barrett.  Specifically,

there are three areas of alleged wrongdoing discussed below that appear to have not caused Mr.

Barrett any injury. Because Plaintiff has not alleged that Mr. Barrett suffered a concrete and particularized injury in a personal and individual way from these practices, she has no standing to complain of these practices.

First, Plaintiff alleges that United "encouraged and trained its agents to, in the event of lapse, persuade its customers to purchase new policies to replace lapsed Policies rather than to reinstate the lapsed policies, which had remaining cash value. The remaining cash value was forfeited to United." (Doc. 29, p. 8.) She also contends that "United willfully, intentionally, deceptively and wrongfully caused or encouraged the lapse of many Policies." (Id. at p. 9.) However, Plaintiff makes no allegation that Mr. Barrett's policy ever lapsed or that this alleged practice ever affected him in any way. Further, there is no allegation that he ever forfeited any cash value to United. Thus, Plaintiff has failed to establish any injury in fact as to United's practices regarding lapsed policies.

Likewise, Plaintiff alleges that United engaged in "defective record[-]keeping practices" and that "United also failed to establish record[-]keeping systems or policies and procedures to effectively administer the Policies." (Id. at pp. 8–9.) She contends that, as a result, policyholders and their beneficiaries "are not likely to discover that their premiums had been misapplied or converted, or that their debit life policies had lapsed or that policy death benefits were due to them." (Id. at p. 8.) However, she has not alleged that Mr. Barrett was harmed by United's flawed record keeping. She does not allege that his premiums were misapplied or converted, that his policy lapsed, or that his beneficiary was not paid any death benefits. Thus, even if United mishandled the records of Mr. Barrett's policy, Plaintiff has not alleged any economic damage or other injury as a result of that mishandling, and, thus, she lacks standing to complain about United's record-keeping practices.

Additionally, Plaintiff contends that "United has failed to pay all of the insurance proceeds to the beneficiaries of insureds after they had received notice of the death of the insured. In other instances, United failed to notice owners of insurance proceeds who were entitled to notice pursuant to the laws of the states which have adopted unclaimed property acts." (Id. at p. 9.) Once again, Plaintiff does not tie this generalized allegation to Mr. Barrett. There is no indication whatsoever in her Amended Complaint that any beneficiary of Mr. Barrett has been deprived of any payment or other benefit due to them under the Policy. Thus, Plaintiff also lacks standing to bring claims based on these practices.

However, United reads the remainder of Plaintiff's claims too narrowly. For example, United argues that Plaintiff "alleges that United purposefully designed and sold inferior insurance products to African-Americans, but [s]he does not allege any facts showing that United refused to offer [Mr. Barrett] products that were being offered to similarly situated Caucasians." (Doc. 34, p. 8.) Plaintiff claims that Mr. Barrett was an African-American customer of United and that United prohibited its agents from selling African-American customers "ordinary life insurance products" that it sold to Caucasians. (Doc. 29, p. 5.) Plaintiff makes numerous allegations of how the policies sold to African Americans, including Mr. Barrett's policy, were inferior to the "traditional" policies that were sold to Caucasians. (Id. at pp. 5–8.) She further contends that this practice was motivated by United's discrimination against African Americans, including Mr. Barrett. (Id.) Thus, Plaintiff contends, this practice caused Mr. Barrett to suffer a violation of his Constitutional rights as well as economic damages for which she seeks economic redress. (Id. at p. 16.) Taking these allegations together, Plaintiff plausibly asserts that Mr. Barrett suffered an actual, personal, and concrete injury that was caused by United's practice of only offering inferior life insurance products to its African-American customers and that this injury will be redressed by

a favorable decision in this case. Consequently, Plaintiff has standing to assert claims based on that practice and others outlined in the Amended Complaint.

For these reasons, the Court **GRANTS IN PART** and **DENIES IN PART** United's Motion to Dismiss Plaintiff's claims for lack of standing. The Court **GRANTS** this portion of United's Motion as to Plaintiff's claims that United failed to keep accurate records, allowed policies to lapse, and failed to pay death benefits,[3] but **DENIES** this portion of United's Motion as to all other claims.

## II.    United's Motion to Dismiss Plaintiff's Claims for Untimeliness

United argues that all of Plaintiff's claims are untimely. (Doc. 34, pp. 10–13.) It contends that the longest potential limitations period for Plaintiff's claims is six years, and that the limitations period began to run on those claims on the date that United issued Mr. Barrett's policy, December 18, 1984. (Id. at p. 10.) United further contends that the Amended Complaint does not allege any facts that would warrant tolling of the statue of limitations. (Id. at pp. 11–13.) Additionally, United argues that Plaintiff cannot plausibly allege that Mr. Barrett could not have discovered his causes of action through reasonable diligence. (Id. at pp. 13–14.)

In response to United's Motion to Dismiss, Plaintiff does not dispute the applicable statutes of limitation as to each of her claims or that those statutes would have ordinarily run before the commencement of this lawsuit. Plaintiff states her position on these points as follows:

> It is not worth disputing the applicable statutes of limitations on each of Plaintiff's claims, as they would have clearly run absent United's concealment. "Georgia courts have long held that the statute of limitation in a contract dispute begins to run on the date that suit on the claim can first be brought." New Morn Foods, Inc.

---

[3] To be clear, to the extent that Plaintiff offers evidence of these practices to serve as proof in support of her viable claims, this ruling should not be construed as necessarily eliminating that evidence. For instance, Plaintiff may argue that United's record-keeping practices prevented Mr. Barrett from discovering his viable causes of action sooner or that some other practice shows United's discriminatory intent towards him. However, because Plaintiff does not allege injury in fact caused by these specific practices, they cannot be the gravamen of her claims.

v. B&B Egg Co., 286 Ga. App. 29, 30 (2007). Under normal circumstances, Plaintiff's claim would have expired in December of 1990.

(Doc. 35, pp. 7–8.) However, according to Plaintiff, the limitations periods were tolled because Mr. Barrett was unaware of the facts giving rise to this lawsuit "until shortly before he filed the original Complaint." (Id. at p. 7.) Plaintiff contends that the Amended Complaint plausibly alleges that United fraudulently concealed its wrongdoing from Mr. Barrett. (Id. at pp. 8–9.)

In its Reply to Plaintiff's Response, United contests Plaintiff's fraudulent concealment argument. (Doc. 36, pp. 3–6.) Among other things, United argues that Plaintiff does not sufficiently allege that United or someone acting on United's behalf "made any affirmative misrepresentation that concealed [Mr. Barrett's] cause of action." (Id. at p. 4.) United also reiterates its argument that Plaintiff cannot satisfy the "reasonable diligence" prong necessary to toll the statute of limitations. (Id. at pp. 4–5.)

The parties agree on the applicable statutes of limitations and do not dispute that each limitations period would have ordinarily commenced upon the issuance of Mr. Barrett's insurance policy. In other words, as Plaintiff admits that her claims are time-barred absent fraudulent concealment, "the only question for the Court is whether the amended complaint alleges facts sufficient to establish the elements of [fraudulent concealment]." (Doc. 36, p. 3.) Therefore, the Court limits its substantive discussion to this issue. For reasons explained below, the Court finds that Plaintiff has plausibly alleged fraudulent concealment to toll the statute of limitations for the bulk of her claims. However, the Court finds that she has not sufficiently alleged fraudulent concealment as to any claims based solely on the fact that Mr. Barrett made premium payments in excess of his policy value. Thus, the Court dismisses as untimely any claim based on that fact alone.

## A. Choice of Law as to Fraudulent Concealment

The parties give short shrift to the issue of which law (federal or state) applies to their tolling by fraudulent concealment arguments. They cite both federal and state law interchangeably with no discussion as to which should apply. (Doc. 34, pp. 10–12; doc. 35, pp. 8–10; doc. 36, pp. 3–5.)[4] Though the parties gloss over this choice of law issue, given the importance of that choice to the Court's decision, it's worthwhile to explain that Georgia law controls the question of tolling as to all of Plaintiff's claims.

Clearly, as to Plaintiff's state law claims, Georgia law provides the applicable limitations periods and rules for tolling those periods. See generally Saxton v. ACF Indus., Inc., 254 F.3d 959, 961 (11th Cir. 2001); McLendon v. Georgia Kaolin Co., 837 F. Supp. 1231, 1241 n. 27 (M.D. Ga. 1993) (citing 4 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1056, p. 179 (2d ed. 1987)).[5] However, the question of what limitations authority applies to Plaintiff's federal Section 1981 claims is more involved.

Under Section 1981, as amended by Congress in the Civil Rights Act of 1991, "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). While Plaintiff cites 42 U.S.C. § 1981 as the statutory authority for her federal race discrimination claims, 42 U.S.C. § 1983 is the procedural vehicle for bringing

---

[4]  United briefly states that "[t]he forum state's law on tolling applies to Plaintiffs' [sic] pendent state law claims; whereas federal common law applies to the tolling of Plaintiffs' [sic] federal claim." (Doc. 34, p. 11 n. 5. (citing Raak Techs., Inc. v. Marx CryptoTech, LP, No. 1:15-CV-4019-CAP, 2016 WL 9451440, at *3 (N.D. Ga. May 2, 2016).) However, United later cites to Georgia law when specifically referring to the elements of fraudulent concealment to toll the statute of limitations. (Doc. 36, pp. 3–4 n. 1.) Moreover, the Court has reviewed Raak, and that decision does not include the proposition for which United cites it.

[5]  Even where state law provides the limitations period and tolling standards, federal law controls the question of whether the plaintiff's allegations are sufficiently specific to meet those standards. Brown v. Lewis, No. 4:08-CV-150 (CDL), 2009 WL 1813206, at *3 (M.D. Ga. June 25, 2009) ("[T]he court analyzes state law to determine what statute of limitations is applicable and whether that limitations period is tolled. Federal law, however, controls whether the allegations supporting the claim's accrual date are sufficient for purposes of a defendant's motion to dismiss.") (citations omitted).

those claims.  See Butts v. County of Volusia, 222 F.3d 891, 893 (11th Cir. 2000) (Section 1983 is the exclusive damages remedy for violation of rights guaranteed by Section 1981).  However, neither Section 1981 nor Section 1983 includes a statute of limitations provision.  Thus, typically, federal courts borrow the forum state's statute of limitations for personal injury actions and apply that statute to a plaintiff's federal civil rights claims.  Wallace v. Kato, 549 U.S. 384, 387 (2007); see also Powell v. Thomas, 643 F.3d 1300, 1303 (11th Cir. 2011) (constitutional claims brought pursuant to Section 1983 "are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought") (internal quotation mark omitted) (quoting Crowe v. Donald, 528 F.3d 1290, 1292 (11th Cir. 2008)).  Further, where a forum state has more than one statute of limitations, the state's general or residual personal injury statute of limitations ordinarily applies to Section 1983 and Section 1981 claims.  Owens v. Okure, 488 U.S. 235, 236, 249–50 (1989); Goodman v. Lukens Steel Co., 482 U.S. 656, 661–62 (1987), superseded by statute as stated in Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 383 (2004).

When applying a forum state's statute of limitations to Section 1983 and 1981 cases, courts also apply that state's rules for tolling of the limitations period.  Wilson v. Garcia, 471 U.S. 261, 269 (1985) ("[T]he length of the limitations period, and closely related questions of tolling and application, are to be governed by state law."), superseded by statute as stated in Jones, 541 U.S. at 383; Bd. of Regents of Univ. of State of N.Y. v. Tomanio, 446 U.S. 478, 483 (1980) ("[T]he federal courts were obligated not only to apply the analogous New York statute of limitations to respondent's federal constitutional claims, but also to apply the New York rule for tolling that statute of limitations."); Zamudio v. Haskins, 775 F. App'x 614, 615–16 (11th Cir. 2019) ("In section 1983 actions, federal courts refer typically to state law to determine the applicable statute of limitations and tolling rules.") (citing Wallace, 549 U.S. at 394); Sentry Corp. v. Harris, 802

F.2d 229, 237 (7th Cir. 1986) ("[C]ourts and commentators have generally distinguished between those provisions relating to traditional tolling doctrines (fraudulent concealment, minority, other legal disabilities) and commencement provisions. With regard to the former, the traditional rule has been that state law controls; with regard to the latter, federal law controls.") (internal citation omitted) (citing *Federal Statutes Without Limitations Provisions*, 53 Colum. L. Rev. 68, 72 (1953)); Bowman v. City of Birmingham, No. 2:04-CV-3487-RDP, 2007 WL 9711414, at *2 (N.D. Ala. Mar. 2, 2007) ("[W]hile state law governs the length of the limitations period and the closely related question of tolling, the determination of when a § 1983 action accrues involves a question of federal law."). Georgia has a two-year statute of limitations for personal injury actions. O.C.G.A. § 9-3-33. Thus, this Court would ordinarily apply that limitations period as well as Georgia's rules for tolling that period when assessing the timeliness of Section 1981 and Section 1983 claims.

However, through the Civil Rights Act of 1991, Congress amended Section 1981's definition of the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Congress's addition of Section 1981(b) overturned the Supreme Court's decision in Patterson v. McLean Credit Union, which had narrowly construed the protective reach of Section 1981 to prohibit race discrimination "only [in] the formation of a contract, but not [in] problems that may arise later from the conditions of continuing employment." 491 U.S. 164, 176 (1989). Prior to this amendment, courts were to apply, in the manner explained above, the most analogous state statute of limitations to all Section 1981 claims. Goodman, 482 U.S. at 661–62, *superseded by statute as stated in* Jones, 541 U.S. at 383. However, in Jones v. R.R. Donnelley & Sons Co., the Supreme Court determined that Section

16

1981 claims that were made possible by the enactment of the Civil Rights Act of 1991 and Section 1981(b) are subject to the default four-year statute of limitations period for federal causes of action as set forth in 28 U.S.C. § 1658(a). 541 U.S. at 374–80. The <u>Jones</u> Court explained that, to the extent Congress created new causes of action not previously cognizable under Section 1981, such new claims are subject to the four-year "catch-all" statute of limitations provided by Section 1658(a). <u>Id.</u> at 380–83. Nonetheless, for causes of action that existed before the enactment of Section 1981(b), the practice of borrowing the relevant state statute of limitations still applies. <u>Edwards v. Nat'l Vision, Inc.</u>, 568 F. App'x 854, 860 (11th Cir. 2014) (per curiam) (citing 28 U.S.C. § 1658; <u>Jones</u>, 541 U.S. at 371). Thus, in Georgia, the state's two-year statute of limitations for personal injury torts controls those Section 1981 claims which existed prior to the 1991 amendment. <u>See</u> O.C.G.A. § 9-3-33; <u>Saunders v. Emory Healthcare, Inc.</u>, 360 F. App'x 110, 114 (11th Cir. 2010) (per curiam).

Here, Plaintiff alleges that United discriminated against Mr. Barrett on account of his race in the formation of his contract by selling him an inferior and more expensive insurance policy than the insurance policies United sold to Caucasians. As explained above, while Plaintiff also generally alleges that United committed other discriminatory acts after the formation of contracts, such as failing to pay death benefits to the beneficiaries of African-American policy holders, she does not have standing to pursue those claims because she does not allege that Mr. Barrett suffered any injuries due to those acts. Accordingly, her claims of racial discrimination pertain to the formation of the insurance contract between Mr. Barrett and United. These claims would have been cognizable prior to the 1991 amendment to Section 1981. Thus, Georgia's two-year statute of limitations for personal injury torts as well as its rules for tolling the limitations period apply to Plaintiff's Section 1981 claims.

For all of these reasons, the Court will apply Georgia's law regarding fraudulent concealment when assessing the timeliness of not only Plaintiff's state claims but also her federal claims.

**B.     Fraudulent Concealment Under Georgia Law**

Under Georgia law, "[i]f the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." O.C.G.A. § 9-3-96.

> [T]o establish fraudulent concealment under this statute sufficient to toll the statute of limitation, a plaintiff must prove that: (1) the defendant committed actual fraud involving moral turpitude, (2) the fraud concealed the cause of action from the plaintiff, and (3) the plaintiff exercised reasonable diligence to discover his cause of action despite his failure to do so within the applicable statute of limitation.

Smith v. Suntrust Bank, 754 S.E.2d 117, 123 (Ga. Ct. App. 2014) (internal quotation marks omitted) (quoting Cochran Mill Assoc. v. Stephens, 648 S.E.2d 764, 768 (Ga. Ct. App. 2007)). Importantly, in Georgia, the rule of fraudulent concealment "is applied even where actual fraud is the gravamen of the action." Anthony v. Am. Gen. Fin. Servs., Inc., 697 S.E.2d 166, 176 (Ga. 2010) (internal quotation mark omitted) (quoting Bahadori v. Nat'l Union Fire Ins. Co., 507 S.E.2d 467 (Ga. 1998)). "Where the basis of an action is actual fraud, the mere silence of the party committing it is treated as a continuation of the original fraud and as constituting a fraudulent concealment, and the statute of limitations does not begin to run against such right of action until such fraud is discovered, or could have been discovered by the exercise of ordinary care and diligence." Shipman v. Horizon Corp., 267 S.E.2d 244, 246 (Ga. 1980).

### C.	Pleading Requirements of Federal Rule of Civil Procedure 9

While the Court turns to Georgia's substantive law for the elements of fraudulent concealment, both parties agree that the Plaintiff's allegations of fraud must meet the pleading requirements of Federal Rule of Civil Procedure 9(b).  (Doc. 34, p. 11; doc. 35, p. 8 ("As Defendants note, allegations of fraudulent concealment must meet the requirements of Fed. R. Civ. P. 9(b).") (citing Larson v. Northrop Corp., 21 F.3d 1164, 1173 (D.C. Cir. 1994)).)  Federal Rule of Civil Procedure 9(b) requires allegations of fraud to be stated "with particularity."  This requirement applies not only to claims of fraud, but also to allegations of fraudulent concealment of claims.  Summer v. Land & Leisure, Inc., 664 F.2d 965, 970 (5th Cir. 1981).  In Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997), the Eleventh Circuit explained that a complaint must plead four things to satisfy the requirements of Rule 9(b): (1) the precise statements or omissions made by the defendant; (2) the time and place of each such statement and the person responsible for the statement; (3) the content of the statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a result of the fraud.  However, "alternative means are also available to satisfy the rule."  Id. (internal quotation marks omitted) (citing Durham v. Bus. Mgmt. Assocs., 847 F.2d 1505, 1512 (11th Cir. 1988); see also Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984) (list containing allegations of fraud describing nature and subject of statements found to be sufficient, even where precise words used were not alleged).  Further, in determining whether a complaint satisfactorily alleges each of these four items, the Court must attend to Rule 8(a)'s prescription that the plaintiff need only plead a short, plain statement of the grounds on which he is entitled to relief.  Brooks, 116 F.3d at 1371.

### D. Whether Plaintiff Plausibly Alleges Fraudulent Concealment

Plaintiff's Amended Complaint lists some generalized and conclusory allegations regarding United's fraudulent concealment.  However, Plaintiff also specifically describes the nature and subject of United's fraudulent statements and makes allegations regarding the timing and circumstances of those statements.  For instance, Plaintiff contends that United's agents and representatives took the following specific actions which constitute actual fraud that concealed United's discrimination from Mr. Barrett:

- labeling rates for African-Americans as "substandard" or "standard" rates while labeling rates for Caucasians as "preferred," (doc. 29, p. 4);

- "approving and dispersing—both by itself and through its agents—false and misleading information and sales materials containing numerous misrepresentations and omissions to Chester Barrett and Class Members," (id. at pp. 7–8);

- "affirmatively and actively conceal[ing] its fraudulent design, marketing and administration of its industrial policies, as well as its racially discriminatory pricing and Policy sales and administration scheme from Chester Barrett and Class Members," (id. at p. 10);

- telling Mr. Barrett at the time of the sale of his life insurance policy that the policy "was a legitimate 'whole life' insurance policy," (id. at p. 19); and

- "engag[ing] in a systematic effort" to "eliminate and confuse the administrative records of Class Members, including [Mr.] Barrett" to prevent them from discovering United's racial discrimination, (id. at p. 10).

In assessing the sufficiency of these allegations, the Court finds persuasive the analysis of similar allegations by the Northern District of Alabama in <u>Moore v. Liberty Nat'l Ins. Co.</u>, 108 F.

Supp. 2d 1266, 1274 (N.D. Ala. 2000), *aff'd sub nom.* Moore v. Liberty Nat'l Life Ins. Co., 267 F.3d 1209 (11th Cir. 2001). In Moore, the plaintiffs brought several state and federal claims alleging that the defendant insurer had engaged in "a systematic, institutional practice of race discrimination in the provision of industrial life insurance to African-Americans." 108 F. Supp. 2d at 1269. Among other things, the plaintiffs alleged that

> while the Defendant calculated policy rates based upon whether a purchaser of insurance was African-American or white, it would intentionally disguise the basis of its rate-setting through the use of neutral-seeming descriptions of those rates: [the insurer] employed the term "standard rates" to refer to insurance rates applicable to African-Americans and the term 'premium rates' to refer to insurance rates available only to white individuals. Thus, an African-American, when sold an insurance policy, would be told that the proportion of premiums to benefits in the policy was determined according to the "standard" rate, rather than that her insurance rates were tied to her race.

Id. at 1270. Just as United does in this case, the defendant insurer in Moore claimed that the plaintiffs' claims were barred by the statute of limitations. Id. at 1273. The Northern District of Alabama rejected this argument under Alabama's fraudulent concealment statute which is akin to that of Georgia. Id. at 1273–74. Specifically, the court found:

> The proposed complaint describes specifically the manner used to conceal the sale of industrial insurance polic[i]es at different rates to African-Americans than to whites under the rubric of "standard" and "premium" rates. The time period in which the statements are made is also demonstrable from the complaint as the time at which the insurance polic[i]es were purchased. [The insurer] is explicitly credited with authoring the misleading language used to characterize its allegedly race-biased rates. The Plaintiffs make clear that the labeling of the rates paid by them as "standard" rates rather than "African-American" rates effectively disguised from them the racially discriminatory nature of those rates. Finally, the Plaintiffs have clearly indicated that the Defendant avoided litigation of the kind presently filed with this Court by describing the insurance rates to be received by African-Americans as "standard." In addition, the Plaintiffs have alleged a relevant time frame for the discovery of the fraudulent concealment that brings them over the hurdle interposed by the statute of limitations.

Id. at 1274.

This Court reaches the same conclusions when looking at the totality of Plaintiff's allegations. Plaintiff has plausibly alleged that United's representatives actively concealed from Mr. Barrett the unlawful discrimination underlying his life insurance policy at the time United sold the policy to him. For one, like the insurer in <u>Moore</u>, United designated rates for African Americans as "standard" or "substandard" as opposed to "preferred" for whites. (Doc. 29, p. 4.) Through this labelling, United "effectively disguised from [Mr. Barrett] the racially discriminatory nature of those rates." <u>Moore</u>, 108 F. Supp. 2d at 1274.

Additionally, at the time United's agent sold the policy to Mr. Barrett, the agent told Mr. Barrett that the policy was a "legitimate 'WHOLE LIFE' policy." (Doc. 29, p. 19.) The word "legitimate" conveyed to Mr. Barrett that the policy United sold him was "accordant with law or with established legal forms and requirements." <u>See</u> <u>Merriam-Webster's Third New International Dictionary Unabridged</u>, <u>http://unabridged.merriam-webster.com</u> (accessed September 16, 2019) .[6] If the allegations of Plaintiff's Amended Complaint are true then the policy was not "legitimate" (i.e., in accordance with the law) because United's discriminatory practices of offering Mr. Barrett an insurance policy inferior to those available to Caucasian customers and charging him premiums above the rates that Caucasian customers would pay, all on account of his race, violated Section 1981.[7] Further, Plaintiff alleges that at the time United agents sold and serviced Mr. Barrett's

---

[6] While the Court cites the current definition of "legitimate," the term had the same meaning when United sold the policy to Mr. Barrett and it has retained that meaning since that time. <u>See</u> <u>Wallace v. Van Pelt</u>, 969 S.W.2d 380, 385 (Mo. App. 1998) ("the term 'legitimate' means 'sanctioned by law or custom; lawful; allowed'") (citing <u>Webster's New Twentieth Century Dictionary</u> 1035 (2d ed. 1979); <u>In re Appeal in Maricopa Cty., Juvenile Action No. JT9065297</u>, 887 P.2d 599, 610 (Ariz. App. 1994) ("An activity is 'legitimate' if it is lawful.") (citing <u>Webster's Ninth Collegiate Dictionary</u> 683 (1984)); <u>People v. Coones</u>, 550 N.W.2d 600, 602 (Mich. App. 1996) ("usual definitions of 'legitimate'" include "'according to the law; lawful,'" or "'[t]hat which is lawful, legal, recognized by law, or according to law'") (citing <u>Random House Webster's College Dictionary</u> (1992) and <u>Black's Law Dictionary</u> (6th ed)).

[7] To underscore this point, United does not contest the merits of Plaintiff's Section 1981 claims in its Motion to Dismiss. Of course, United may contest those merits as this lawsuit progresses. But, United appears to concede at this stage that if Plaintiff's allegations were true United violated Section 1981.

policy, they represented that his insurance policy and premiums were based on "legitimate" race-neutral considerations and that they gave him "false and misleading information and sales material containing numerous misrepresentations and omissions." (Doc. 29, pp. 4, 7–8, 19.) These representations actively concealed from Mr. Barrett the unlawful discrimination underlying his transaction with United.

Moreover, Plaintiff has plausibly alleged that United's representatives knew the falsity of these misrepresentations at the time they made them to Mr. Barrett. (Id. at p. 19.) United's deceptive sales pitch to Mr. Barrett was part of a "nationwide scheme" through which "United targeted low income, unsophisticated and minority segments of the population, especially in the Southeastern United States, including Chester Barrett, and developed insurance products for sale to these consumers." (Id. at p. 3.)

In other words, when the Amended Complaint is taken as a whole, Plaintiff plausibly alleges that United's agents knew the unlawfulness underlying Mr. Barrett's policy. They knew that his insurance policy was inferior and that his premium rates were higher than those of United's Caucasian customers. Despite their knowledge, these agents made representations to Mr. Barrett, at the time they sold the policy to him and when collecting premiums from him, that actively concealed that unlawfulness. This active deception is the gravamen of Plaintiff's right of action, and, under Georgia law, the "mere silence of [United] is treated as a continuation of the original fraud and as constituting a fraudulent concealment, and the statute of limitations does not begin to run against such right of action until such fraud is discovered, or could have been discovered by the exercise of ordinary care and diligence." Shipman, 245 S.E.2d at 809.

Plaintiff has also plausibly alleged that Mr. Barrett "exercised reasonable diligence" but "did not discover" United's discriminatory conduct until bringing this cause of action. Smith, 754

S.E.2d at 123. Put another way, it is not clear from the face of the Amended Complaint "that the plaintiff can prove no set of facts" that Mr. Barrett remained unaware of United's unlawful conduct despite his exercise of reasonable diligence. Valencia, 2014 WL 7240526, at *3. Among other allegations on this point, Plaintiff states that Mr. Barrett "had no knowledge of United's scheme and unlawful conduct and either did not learn of, or did not learn the extent of, United's fraudulent course of conduct until the filing of this action." (Doc. 29, p. 11.)

United disputes this allegation by arguing that "[t]he very same 'discriminatory premiums' allegations made by [Plaintiff on behalf of Mr.] Barrett in this case were asserted in a prior class action against United more than a decade ago." (Doc. 34, p. 13.) However, United fails to explain why Mr. Barrett should have been aware of a lawsuit litigated in the Circuit Court of Jefferson County, Alabama.[8] Furthermore, according to the face of Plaintiff's Amended Complaint, Mr. Barrett had no reason to investigate whether his life insurance policy was discriminatory because he had no knowledge of United's discriminatory practices for years leading up to this lawsuit. Cf. Bauer v. Weeks, 600 S.E.2d 700, 703 (Ga. Ct. App. 2004) (homeowner's knowledge that "'something was amiss' with the watertight integrity of the house . . . 'put [homeowner] on notice so that by the exercise of due diligence [he] should have discovered the alleged fraud.'") (quoting Gerald v. Doran, 311 S.E.2d 225, 226 (Ga. Ct. App. 1983)).

Moreover, the Supreme Court of Georgia has explained that while "reasonable diligence" must be measured by an objective standard of ordinary care "it is for the jury to apply the unvarying standard of ordinary care to the facts and exigencies of each particular case." Jim Walter Corp. v.

---

[8] United attaches copies of the amended complaint and the order and final judgment from that case as exhibits to its Motion to Dismiss. (See Doc. 34-2; doc. 34-3.) Because the Court does not find that these materials warrant dismissal of Plaintiff's claims, the Court need not resolve whether it is proper to consider these materials that are outside of the pleadings at the motion to dismiss stage. See, Mesidor v. Waste Mgmt., Inc. of Fla., 606 F. App'x 934, 935 (11th Cir. 2015) (discussing circumstances where it is permissible for court to consider materials outside the pleadings on a motion to dismiss).

Ward, 265 S.E.2d 7, 9 (Ga. 1980) (internal quotation marks omitted) (quoting Wright v. Dilbeck, 176 S.E.2d 715, 727 (Ga. Ct. App. 1970)); see also Smith, 754 S.E.2d at 125 ("Whether a [party] exercised reasonable care in discovering the fraud is generally a jury question.") (internal quotation marks omitted) (quoting Fed. Ins. Co. v. Westside Supply Co., 590 S.E.2d 224 (Ga. Ct. App. 2003)); McLendon v. Ga. Kaolin Co., 837 F. Supp. 1231, 1242 (M.D. Ga. 1993) ("Whether a party exercised due diligence in discovering the alleged fraud is normally a jury question.") (citing Brown v. Brown, 75 S.E.2d 13 (Ga. 1953) and 37 Am. Jur. 2d Fraud and Deceit § 408 (1968)). Particularly given that Georgia courts have found reasonable diligence to ordinarily be a fact-intensive inquiry typically left to a jury, United's arguments regarding Mr. Barrett's reasonable diligence at this early stage are unavailing and perhaps premature.

For these reasons, the Court rejects United's arguments that the entirety of Plaintiff's Amended Complaint must be dismissed for noncompliance with the statutes of limitations. However, the Court recognizes that discovery in this case may produce additional evidence that could support United's contentions of untimeliness. Accordingly, the Court **DENIES** United's motion to dismiss the entirety of Plaintiff's claims for failure to comply with the statutes of limitations **WITHOUT PREJUDICE**. If supported by the undisputed material facts, United may again raise its timeliness arguments at the motion for summary judgment stage. However, for the reasons stated below, the Court finds that any claims based solely on the fact that Mr. Barrett paid more in premiums than the face amount of his policy are untimely.

### E.     Untimeliness of Claims that Mr. Barrett's Premium Payments Exceeded Face Amount of his Policy

Throughout Plaintiff's pleadings, she emphasizes that Mr. Barrett paid $14,649.05 in premiums for a policy with a death benefit of $5,000. (See, e.g., Doc. 29, p. 6; doc. 35. p. 11.) It is not clear if Plaintiff is asserting a claim based on the mere fact that Mr. Barrett paid more in

premiums than his policy is worth. However, even if this allegation alone could independently support a cause of action, that claim would be untimely.[9] Again, as to all her claims, Plaintiff concedes that, absent fraudulent concealment, her claims are barred by the statute of limitations. However, unlike with the discrimination underlying Mr. Barrett's policy, Plaintiff has failed to plausibly allege fraudulent concealment as to the mere amount of Mr. Barrett's premium payments or the face value of his policy.

Plaintiff claims that "United knew, but never disclosed to Class Members, including Chester Barrett, that over the normal life expectancy of the Class Members, the small premiums would often far exceed the face value of the Policies." (Doc. 29, p. 5.) However, failing to disclose information is materially different from affirmatively misrepresenting information. Absent a confidential relationship, such silence cannot give rise to fraudulent concealment. Fed. Ins. Co., 590 S.E.2d at 229 ("Concealment of the cause of action 'must be by positive affirmative act and not by mere silence.'") (quoting Comerford v. Hurley, 268 S.E.2d 358, 360 (Ga. Ct. App. 1980)). Plaintiff has not alleged that United's agents misrepresented the amount of premiums Mr. Barrett would pay or the face value of his insurance policy. Moreover, even if United's agents had misrepresented this information, the death benefits payable under the policy and the amount of the premium payments were readily apparent from the face of the policy. Thus, as United points out, "[Mr.] Barrett could have easily determined that the aggregate premiums required by his policy

---

[9] Absent discrimination and fraud underlying the transaction, Plaintiff has failed to explain how the disparity between the premiums Mr. Barrett paid for the policy and the amount of death benefit due under the policy violated the law. In other words, even if this was a terrible bargain for Mr. Barrett, Plaintiff has failed to explain how the terms of the deal themselves (as opposed to any fraud or discrimination underlying the deal) give rise to a cause of action. While Plaintiff alleges that "United did not explain to [Mr. Barrett] that he would likely pay more in premiums than [his beneficiaries] would receive through the death benefit if he lived a normal actuarial life, much less a life of ninety-eight years," (doc. 35, p. 11), she has not cited any authority that United had an affirmative duty to make that disclosure or that United violated any law by failing to disclose that information. This provides another independent basis for dismissal of any claim based solely on the fact that Mr. Barrett paid premiums exceeding the face amount of his policy.

might one day exceed the face amount simply by doing some simple math." (Doc. 34, p. 14.) Thus, Mr. Barrett could not have reasonably relied upon any misrepresentations United made as to the amount of premiums he would pay or as to the amount of his policy. See Allmond v. Young, 723 S.E.2d 691, 693 (Ga. Ct. App. 2012) ("[M]ere silence or a failure to disclose . . . will not toll the statute of limitation for fraud where the information was open and available.") (intenral quotation marks and citation omitted).

For these reasons, to the extent that Plaintiff asserts an independent cause of action based solely on the fact that Mr. Barrett paid premiums to United that exceeded the amount of his life insurance policy, the Court **GRANTS** United's Motion to Dismiss that claim as untimely.[10]

### III. United's Motion to Dismiss Plaintiff's State Law Claims for Failure to State a Claim

United does not attack the substantive plausibility of Plaintiff's federal civil rights claims in its Motion to Dismiss. However, it does argue that the Court should dismiss Plaintiff's state law claims for failure to state a claim. The Court addresses each of those claims in turn.

#### A. Breach of Contract

Plaintiff does not oppose United's Motion to Dismiss her claim for breach of contract. (Doc. 35, pp. 11–12.) Accordingly, the Court **GRANTS** United's motion as to this claim and **DISMISSES** Plaintiff's claim for breach of contract.

---

[10] To be clear, to the extent that Plaintiff offers the disparity between Mr. Barrett's premium payments and the amount of his policy as evidence in support of any viable claims, this ruling should not be construed as necessarily excluding that evidence. By way of hypothetical example, Plaintiff may argue, in support of her claims of discrimination, that United offered Caucasian customers insurance polices that had a far more favorable relationship between premiums paid and death benefits payable than the policy offered to and purchased by Mr. Barrett. In that situation, Mr. Barrett would still have been aware at the time he contracted with United of the bargain he made with United (i.e. the total payments he could ultimately make on his policy and the benefits payable under that policy). However, if Plaintiff's allegations are true, Mr. Barrett would not have been aware that Caucasian customers were offered a much better bargain than he was on account of his race.

### B.    Money Had and Received

United argues that Plaintiff's claim for money had and received must be dismissed because "that theory is available only when no enforceable contract exists between the parties."  (Doc. 34, p. 16 (citing <u>Goldstein v. Home Depot U.S.A., Inc.</u>, 609 F. Supp. 2d 1340, 1347 (N.D. Ga. 2009) and <u>Baghdady v. Cent. Life Ins. Co.</u>, 480 S.E.2d 221, 224 (Ga. Ct. App. 1996)).  Plaintiff opposes this motion and argues that there is "a question of public policy as to whether the contract was ever enforceable, and whether Plaintiff is entitled to equitable relief for premiums paid."  (Doc. 35, p. 12.)  Plaintiff's support for this argument is vague and refers primarily to O.C.G.A. § 33-26-6.2, a statute that Plaintiff concedes is not applicable to Mr. Barrett's policy.  (<u>Id.</u>)  It appears that Plaintiff may be contending that the fact that Mr. Barrett ultimately paid over $14,000 for a policy with a $5,000 death benefit somehow renders the contract unenforceable.  However, as explained above, any claim based on the mere fact that Mr. Barrett paid more in premiums than the amount the policy is worth is untimely.  Further, these payments were in accordance with the express terms of Mr. Barrett's insurance policy, and Plaintiff does not cite any statute, case law, or other authority that would invalidate that payment structure.

Nonetheless, for the reasons explained herein, Plaintiff's Section 1981, negligent misrepresentation, and fraudulent inducement claims survive United's Motion to Dismiss.  The parties have not addressed what effect those claims and the factual allegations underlying them have on Plaintiff's claim for money had and received.  For instance, the parties have not addressed whether fraud and discrimination underlying the parties' transaction would void the contract between United and Mr. Barrett, much less cited applicable authority on that question.  Given the uncertainty produced by this dearth of argument and authority, the Court **DENIES** United's Motion to Dismiss Plaintiff's claim for money had and received.

### C. Negligent Misrepresentation and Fraudulent Inducement

United's arguments for dismissal of Plaintiff's negligent misrepresentation and fraudulent inducement claims largely mirror its arguments against fraudulent concealment. It claims that Plaintiff's claims do not satisfy the pleading requirements of Rule 9(b), that United's agents' statements were mere "puffery or opinion," and that plaintiff fails to allege that Mr. Barrett reasonably relied on those statements. (Doc. 34, pp. 17–20.) The Court rejects these arguments for the same reasons that it rejected United's arguments regarding fraudulent concealment. Plaintiff sufficiently alleges that United agents made fraudulent statements to Mr. Barrett when selling him his policy and when servicing that policy at his home. As explained above, United agent's statement to Mr. Barrett that his policy was "legitimate" was not merely puffery. Rather, that was a representation that Mr. Barrett's policy complied with the law, which United's agents knew to be false at the time they made the representation. Furthermore, by representing that Mr. Barrett's policy and premiums were based on a "standard" or "substandard" rate system, United's agents misrepresented the truth—that Mr. Barrett's policy and premiums were based on his race. Through these statements and other actions described in the Amended Complaint, United's representatives did not merely provide Mr. Barrett with opinions. Rather, they actively concealed facts, specifically that Mr. Barrett's insurance product was inferior and that his premiums were higher due to his race. They misrepresented these facts in order to induce Mr. Barrett to enter into a contract with United.

United further argues that Mr. Barrett's "alleged reliance on United's alleged misrepresentations was not reasonable because he could have determined the veracity of those statements merely by examining his policy." (<u>Id.</u> at p. 20.) Indeed, United is correct that Mr. Barrett could have discovered the amount of his insurance policy and the premiums he would have

to pay from the face of the policy. However, his policy did not disclose that his insurance product and his premium rates were less favorable than those offered to Caucasian customers based on his race. Thus, Mr. Barrett could not have discovered that United agents were lying to him when they told him that his policy was legitimate (put another way, lawful) and he could not have discovered United's scheme to hide the discrimination underlying his insurance policy from him.

For all these reasons, the Court **DENIES** United's Motion to Dismiss Plaintiff's fraudulent inducement and negligent misrepresentation claims.

### D. Punitive Damages

As to punitive damages, United solely argues that because Plaintiff's other claims must be dismissed, she has no underlying cause of action on which to request a punitive award. (Id. at pp. 20–21.) However, as explained above, Plaintiff has stated viable claims including violations of Section 1981, fraudulent inducement, and negligent misrepresentation. As United's arguments against punitive damages hinge on the viability of those underlying claims, the Court **DENIES** United's Motion to Dismiss Plaintiff's claims for punitive damages.

### E. Declaratory and Injunctive Relief

United argues that Plaintiff's claims for declaratory and injunctive relief are moot due to Mr. Barrett's death. (Doc. 34, p. 21.) Plaintiff responds that it agrees that these claims could be dismissed. (Doc. 35, p. 15.) Accordingly, the Court **GRANTS** United's Motion to Dismiss Plaintiff's claims for declaratory and injunctive relief.

**CONCLUSION**

For the reasons and in the manner set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** United's Motion to Dismiss, (doc. 34). The Court **GRANTS** United's Motion to Dismiss for lack of standing as to Plaintiff's claims that United failed to keep accurate records, allowed policies to lapse, and failed to pay death benefits. However, the Court **DENIES** United's Motion to Dismiss for lack of standing as to all other claims. The Court also **GRANTS** United's Motion to Dismiss for untimeliness as to Plaintiff's claims that Mr. Barrett paid premiums exceeding the face value of his policy. However, the Court **DENIES WITHOUT PREJUDICE** United's Motion to Dismiss for untimeliness as to all other claims. Further, the Court **DENIES** United's Motion to Dismiss for failure to state a claim as to Plaintiff's claims for money had and received, negligent misrepresentation, fraudulent inducement, and punitive damages. The Court **GRANTS AS UNOPPOSED** United's Motion to Dismiss for failure to state a claim as to Plaintiff's claims for breach of contract, declaratory relief, and injunctive relief.

Pursuant to the Court's January 8, 2018 Scheduling Order, "Phase 2" or class certification discovery is set to commence in this case immediately upon this ruling. (Doc. 12, p. 2.) However, given the amount of time that has passed since the issuance of the Scheduling Order, the Court finds that it is proper to hear from the parties regarding the status of this case and the information exchanged in Phase 1 discovery prior to commencing with class certification discovery. Additionally, given the above discussion, the parties may find it necessary to conduct discovery regarding the timeliness of Plaintiff's individual claims prior to engaging in class discovery. Accordingly, the Court **STAYS** all proceedings and deadlines in this case until further order of the Court and **DIRECTS** the parties to each file a status report with the Court within **twenty-one days**

of the date of this Order.  Following review of the parties' status reports, the Court will address the future progress of this case.

      **SO ORDERED**, this 23rd day of September, 2019.

_____
JUDGE R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA