**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | |
|---|---|
| MINERVA BARRETT, executrix of the estate of Chester Barrett, and on behalf of all others similarly situated, | |
| Plaintiff, | CIVIL ACTION NO. 4:17-cv-00215 |
| v. | |
| UNITED INSURANCE COMPANY OF AMERICA, INC., | |
| Defendant. | |

**O R D E R**

This putative class action originates from a life insurance policy purchased from Defendant United Insurance Company of America, Inc. by Chester Barrett on December 18, 1984.  (Doc. 29.) Plaintiff Minerva Barrett, the executrix of Mr. Barrett's estate, claims that United Insurance Company of America, Inc. ("United") used racially discriminatory practices in selling life insurance to Mr. Barrett and other African Americans in violation of 42 U.S.C. § 1981.  (Id. at pp. 15–16.)  Plaintiff also asserts state law claims for money had and received, fraudulent inducement, and negligent misrepresentation.  (Id. at pp. 16–17, 19–20.)  Presently before the Court is United's Motion for Summary Judgment.  (Doc. 56.)  In its Motion, United argues that Plaintiff cannot put forth sufficient evidence to create a genuine dispute of material fact for any of her claims.  (Id. at pp. 6–11.)  United also argues that Plaintiff's claims are barred by the applicable statutes of limitation.  (Id. at pp. 11–13.)  Also before the Court is Plaintiff's Motion for Class Certification. (Doc. 65.)  Both Motions have been fully briefed.  (Doc. 63; doc. 69; doc. 70; doc. 72.)  For the

following reasons, the Court **GRANTS** United's Motion for Summary Judgment, (doc. 56), and **DENIES AS MOOT** Plaintiff's Motion for Class Certification, (doc. 65).

## BACKGROUND

### I.   Factual Background

United is an insurance company whose primary business is selling "relatively small fac[e] amount policies" to individuals, typically for the purpose of covering burial and end-of-life expenses. (Doc. 64, pp. 1–2.) United's insurance agents have historically collected premiums from policyholders in person, on a weekly or monthly basis. (Id. at p. 2.) In 2002, United settled a class action suit alleging that it discriminated against African Americans "by using rate scales that charged African American insureds higher insurance rates than similarly situated Caucasian insureds." (Doc. 57, p. 7; see also doc. 64, p. 6.) According to United's in-house counsel, who investigated the allegations in the 2002 class action, United "stopped selling policies with race-based rate scales and using race-based underwriting practices by the 1970s." (Doc. 57, p. 7.)

Chester Barrett purchased a whole life insurance policy from United in 1984. (Doc. 64, p. 3.) The face amount of the policy was $5,000 dollars and the policy required Mr. Barrett to pay a monthly premium of $36.35. (Doc. 29-2, pp. 4–5.) Although Plaintiff has provided no evidentiary support, Mr. Barrett allegedly paid United a total of roughly $14,649.05 under the policy prior to his death. (Doc. 29, p. 6; doc. 64, p. 7.) Notwithstanding the fact that the Amended Complaint alleges as much, Plaintiff has admitted during discovery that she does not know whether United gave Mr. Barrett any false or misleading information concerning the policy or whether United ever told him that his policy was a legitimate whole life policy. (Doc. 64, p. 8; doc. 57, pp. 139, 142.) Plaintiff also does not know whether United ever refused to provide Mr. Barrett with accurate information concerning the policy or concealed any facts about the policy from him. (Doc. 64, pp.

8–9; doc. 57, pp. 141–42.)  In addition, neither party disputes that United stopped selling life insurance policies that used a different rate scale for African American customers and Caucasian customers "well before Mr. Barrett purchased his policy[.]"  (Doc. 64, pp. 2–3.)  Both parties also agree that United did not have "a policy or practice of marketing or underwriting life insurance policies based on the race of its customer[s]" at the time that Mr. Barrett purchased his policy.  (Id.)  Finally, there is no dispute that United paid the full $5,000 benefit of the policy after Mr. Barrett's death.  (Id. at p. 7.)

Plaintiff submitted an affidavit of Dr. Robert Klein, who "is an Emeritus Professor in the Department of Risk Management and Insurance with Georgia State University and received a Ph.D. in Economics from the University of Michigan in 1986."  (Doc. 63-1, p. 1.)  In his affidavit, Dr. Klein states that "Mr. Barrett's policy was a type of industrial life insurance[1] . . . policy that is heavily market[ed] to low-income [individuals], particularly African Americans, for the stated purposes of providing funds for their burial and other end-of-life expenses."  (Id.)  He also notes that, "[g]enerally, industrial life policies are directly linked to, and reliant upon[,] racial discrimination."  (Id.)  Dr. Klein also provided an expert report.  (Doc. 65-1, pp. 23–64.)  In that report, Dr. Klein provided a statistical analysis of the "Zip code data provided by United on the

---

[1]  Although Dr. Klein refers to Mr. Barrett's policy as a type of industrial life insurance (and many of his opinions in his affidavit are simply generalizations about industrial life policies), Mr. Barrett's policy does not meet the Georgia statutory definition to be considered—and regulated—as such.  Georgia law provides in part that "[i]ndustrial life insurance is that form of insurance under which not more than $2,000.00 on a single life, exclusive of additional benefits in the event of death from accidental means, is payable on any such policy for which the premiums are payable monthly."  O.C.G.A. § 33–26–1.  Mr. Barrett's policy had a face amount of $5,000.  (Doc. 29-2, p. 5.)  Indeed, in his expert report, Dr. Klein concedes that "Mr. Barrett's policy would not meet the statutory definition of industrial life insurance in Georgia, as its face amount was $5,000."  (Doc. 65-1, p. 42.)

locations of the owners and insureds for the type of policy that it sold to Mr. Barrett."[2]  (Id. at p.

54.)  The results of his analysis "indicate that United has significantly more policies in force (in

relation to their populations) in high-minority Zip codes than in low-minority Zip codes."  (Id. at

pp. 58–59.)  In addition, in his affidavit, he states that policies like the one purchased by Mr. Barrett

are "typically high in premium costs relative to the actual benefit" and "[t]he marketing and sale

of these policies seek to take unfair advantage of consumers who are 'unsophisticated' with respect

to their understanding of what they are buying."  (Doc. 63-1, pp. 1–2.)  Finally, his affidavit posits

that "United engaged in unfair practices in it marketing, sale, and administration of Mr. Barrett's

policy."  (Id. at p. 2.)

## II.    Procedural History

Mr. Barrett initially filed this putative class action in the State Court of Liberty County on

September 20, 2017.  (Doc. 1-1.)  United then removed the case to this Court.  (Doc. 1.)  After

removal, Mr. Barrett filed an Amended Complaint.  (Doc. 29.) Mr. Barrett died on August 3, 2018,

(doc. 29-1), and the Court substituted Plaintiff—the executrix of his estate—as the named plaintiff

in the case, (doc. 33).  United then filed a Motion to Dismiss.  (Doc. 34.)  The Court granted the

Motion in part and denied it in part.  (Doc. 38.)  Specifically, the Court dismissed any of Plaintiff's

claims that were "based solely on the fact that Mr. Barrett paid premiums to United that exceeded

the amount of his life insurance policy."  (Id. at p. 27.)  United has now filed the at-issue Motion

for Summary Judgment.  (Doc. 56.)  Plaintiff filed a Response, (doc. 63), and United filed a Reply,

(doc. 69).  Plaintiff also filed a Motion for Class Certification, (doc. 65), to which United has filed

a Response, (doc. 70.)  In her Reply in support of class certification, Plaintiff clarified that the

---

[2]  Dr. Klein used Zip code data because United did "not include information on the race, education, or income of its policyholders and insureds."  (Doc. 65-1, p. 55.)  Plaintiff does not dispute that "United has not captured the race of its customer[s] in the sales or [u]nderwriting process" since before Mr. Barrett purchased his policy.  (Doc. 64, p. 3.)

"proposed class is for 'All African American persons in the State of Georgia who have purchased an Industrial life policy from United Life Insurance Company of America, Inc. [o]n which they were required to pay premiums in excess of the face value of the policy itself.'"  (Doc. 72, p. 4.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable

to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. (citation and emphasis omitted).

## DISCUSSION

Plaintiff claims that United violated Section 1981 through its discriminatory practices in selling insurance to Chester Barrett and other African Americans.  (Doc. 29, pp. 15–16.)  She also brings state law claims for money had and received, fraudulent inducement, and negligent misrepresentation, which are all based on the same allegations of discrimination.  (Id. at pp. 16–17, 19–20; see also doc. 38, pp. 28–30.)  United argues that Plaintiff has not provided sufficient evidence to support any of these claims.  (Doc. 56, pp. 6–11.)  United also argues that Plaintiff's claims are barred by the applicable statutes of limitation.  (Id. at pp. 11–13.)  The Court will first address whether Plaintiff has provided enough evidence to create a genuine issue of material fact as to each of her claims, and then the Court will turn to whether Plaintiff's claims are time-barred.  Finally, the Court will address Plaintiff's Motion for Class Certification.[3]  (Doc. 65.)  For the

---

[3] Federal Rule of Civil Procedure 23(c) requires that district courts decide the issue of class certification "[a]t an early practicable time after a person sues." Fed. R. Civ. P. 23(c)(1).  However, the Eleventh Circuit has noted that it may be appropriate in certain cases to rule on a motion for summary judgment before ruling on a motion for class certification.  See Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1289 (11th Cir. 2001) ("We note . . . that the district court is not required to resolve [plaintiff]'s class certification request before resolving a challenge to [plaintiff]'s individual claim.  If the district court were to resolve a summary judgment motion in [d]efendants' favor and in so doing dismiss [plaintiff]'s individual claim before ruling on class certification, then [plaintiff] would not be an appropriate class representative.").  Accordingly, the Court addresses United's Motion for Summary Judgment prior to turning to the Motion for Class Certification.

reasons laid out below, the Court **GRANTS** United's Motion for Summary Judgment, (doc. 56), and **DENIES AS MOOT** Plaintiff's Motion for Class Certification, (doc. 65).

## I.      Plaintiff's Section 1981 Claim

According to Plaintiff's Amended Complaint, United violated Section 1981 "by charging African[]Americans, including Chester Barrett, higher premiums than those charged to similarly situated Caucasian policyholders, and by prohibiting its agents from selling participating whole life insurance products to African[]Americans." (Doc. 29, p. 16.) Under Section 1981, as amended by Congress in the Civil Rights Act of 1991, "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (1991). Section 1981 defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b). "The elements of a cause of action under § 1981 are: '(1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute.'" Lopez v. Target Corp., 676 F.3d 1230, 1233 (11th Cir. 2012) (quoting Kinnon v. Arcoub, Gopman & Assocs., Inc., 490 F.3d 886, 891 (11th Cir. 2007)). United does not dispute the first element but argues that "Plaintiff has no evidence that United discriminated against Mr. Barrett in the making or enforcement of his life insurance policy." (Doc. 56, p. 6.)

As an initial matter, Plaintiff flatly admits that "United has not sold life insurance policies that use a different rate scale for African American customers than for Caucasian customers" since before Mr. Barrett purchased his policy. (Doc. 64, pp. 2–3.) United's in-house counsel has testified, via affidavit, that United "stopped selling policies with race-based rate scales and using

race-based underwriting practices by the 1970s[,]" (doc. 57, p. 7), and Plaintiff has provided no evidence to rebut this statement.  Instead, Plaintiff argues that because United agents collected premiums in person, those agents must have perceived the race of potential customers.  (Doc. 63, pp. 7–8.)  Plaintiff, however, has not pointed to any evidence in the record that United offered non-African American individuals life insurance policies with more favorable premiums than Mr. Barrett's policy at the time Mr. Barrett purchased the policy.  The only other evidence that Plaintiff cites in her Response Brief is Dr. Klein's affidavit, which she claims shows that "United did discriminate against [Mr. Barrett] based upon his race, by assigning him an Industrial Life Policy that required payments in excess of the face value of the policy itself, a practice which according to relevant literature is directed toward low-income and racial minorities specifically."[4]  (Id. at p.

---

[4] Plaintiff argues that Defendant's Motion for Summary Judgment should be denied because it "is wholly predicated on the sparse discovery conducted by Defendant" and "[w]hile Plaintiff was restricted in her discovery for purposes of class certification, Defendant has maintained that it was permitted to conduct discovery on the merits, without allowing Plaintiff the opportunity to do the same." (Doc. 63, p. 2.)  The Court rejects this argument for several reasons.  First, the law is well-settled that a Defendant has considerable discretion in deciding when to file a motion for summary judgment.  See Fed. R. Civ. P. 56(b) ("Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery."); see also Cagle v. United States, No. 3:15-cv-0350-J-20JBT, 2017 WL 6365897, at *1 (M.D. Fla. June 7, 2017) ("[P]arties are free to file their motions [for summary judgment] any time prior to the established case deadline, and doing so does not confer either party a 'tactical advantage.'").  Second, the Amended Scheduling Order, which was entered in July 2020, made clear that the deadline for United to file a motion for summary judgment on Plaintiff's individual claims was December 18, 2020, (which was, in fact, the date on which United filed its Motion) and that Plaintiff's deadline to respond to any such motion was January 15, 2021, (doc. 47, p. 2).  Thus, Plaintiff had notice that she would have to be prepared to respond to United's Motion by that time.  Third, the record shows that Plaintiff did conduct discovery related to the merits of this case by at the very least, serving both interrogatories and requests for production.  (Doc. 69-1, pp. 12–33.)  Finally, and most importantly, if Plaintiff did not believe she had adequate time to conduct discovery in order to respond to United's Motion for Summary Judgment, she should have filed a Rule 56(d) motion asking the Court to defer consideration of United's Motion until she could obtain the evidence she believes she needed.  See, e.g., Garner v. City of Ozark, 587 F. App'x 515, 518 (11th Cir. 2014) (per curiam) ("Fed. R. Civ. P. 56(d) allows a district court to deny a summary judgment motion when a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition.") (quotations omitted).  Plaintiff has not filed a motion, much less an affidavit or declaration in support thereof, seeking more time for discovery.  In addition, even if the Court construed Plaintiff's single-paragraph argument in her Response Brief as a Rule 56(d) motion, it would fail because Plaintiff does not explain what facts she expects to find with additional discovery or how those facts would prevent summary judgment.  See Harbert

7.)  Dr. Klein is "a former Professor of Risk Management and Insurance at Georgia State University" whom Plaintiff hired "to create reports, maps, and other diagrams demonstrating the demographics of the [individuals insured by United] listed by [Z]ip code and policy number."  (Id. at pp. 4–5; see also doc. 63-1; doc. 65-1, pp. 23–66.)  United argues that the Court should not consider the evidence present by Dr. Klein in determining whether to grant its Motion for Summary Judgment because Plaintiff did not comply with the necessary disclosure requirements.  (Doc. 69, p. 8 n.3.)  Thus, the Court will first address the admissibility of Dr. Klein's evidence before turning to the merits of Plaintiff's Section 1981 claim.

> **A.    The Evidence Provided by Dr. Klein must be Excluded Due to Plaintiff's Failure to Comply with Rule 26.**

Federal Rule of Civil Procedure 26(a)(2)(A) "requires parties to disclose the identity of any witness that may be used at trial to present expert opinion evidence under the Federal Rules of Evidence."  Silverstein v. Procter & Gamble Mfg. Co., 700 F. Supp. 2d 1312, 1319 (S.D. Ga. 2009).  In addition, "this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."  Fed. R. Civ. P. 26(a)(2)(B).  Alternatively, "if the witness is not required to provide a written report, this disclosure must state the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and a summary of the facts and

---

Int'l, Inc. v. James, 157 F.3d 1271, 1280 (11th Cir. 1998) ("A Rule 56[(d)] motion must be supported by an affidavit which sets forth with particularity the facts the moving party expects to discover and how those facts would create a genuine issue of material fact precluding summary judgment."); Fla. Power & Light Co. v. Allis Chalmers Corp., 893 F.2d 1313, 1316 (11th Cir. 1990) ("It is clear that [a party] cannot 'rest on vague assertions that additional discovery will produce needed, but unspecified facts, but rather must specifically demonstrate how postponement of a ruling on the motion will enable [it], by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'") (quoting Wallace v. Brownell Pontiac-GMC Co., Inc., 703 F.2d 525, 527 (11th Cir. 1983)).

opinions to which the witness is expected to testify."  Fed. R. Civ. P. 26(a)(2)(C).  Finally, the Scheduling Order in this case, which the parties proposed and the Court entered on January 8, 2018, required Plaintiffs to make all Rule 26(a)(2) disclosures for "any individual who may provide expert testimony at trial within 120 days of the date this Court rules on Defendants' [then] pending motions to dismiss."  (Doc. 16, p. 2.)

The Court ruled on the motions to dismiss that were pending at the time of the Scheduling Order on December 19, 2018.  (Doc. 26.)  Thus, Plaintiff had to provide the required expert disclosures by April 18, 2019.[5]  Plaintiff did not disclose Dr. Klein to United in the Initial Disclosures that she submitted on January 29, 2020, and United's attorney states that "Plaintiff never amended or supplemented" her Initial Disclosures and "never served any other document disclos[ing] Robert Klein."[6]  (Doc. 69-1, pp. 4–10.)  Thus, based on the record, it appears that Plaintiff did not make United aware of Dr. Klein until she filed her Response Brief on January 15,

---

[5] The Court issued a revised scheduling orders on July 23, 2020 and December 18, 2020.  (Docs. 47, 55.)  However, those orders did not amend the deadline for expert disclosures.  (Id.)  In the joint motion prior to the first amended scheduling order, the parties proposed a deadline of fifteen days prior to the filing of an opposition brief for the party to make Rule 26(a)(2) disclosures for any expert witness that the party would rely on in opposition to a motion for summary judgment.  (Doc. 46, p. 2.)  However, the Court specifically declined to enter the parties' proposed deadlines.  (Doc. 47.)  Moreover, even if the Court had imposed the deadline requested by the parties, Plaintiff did not comply with it as to Dr. Klein.  Additionally, the Court provided a deadline of March 3, 2021 for the parties to file a status report and any revised scheduling order with additional discovery deadlines.  (Doc. 55, p. 2.)  Plaintiff did not file any motion at that time for additional time to provide expert reports, and the parties' joint status report did not contain any such request.  (Doc. 71.)  Indeed, Plaintiff and Defendant eventually requested, and the Court granted, a stay until the Court resolved Defendant's already-pending Motion for Summary Judgment.  (Docs. 73, 74.)  Thus, even in the face of Defendant's argument that Plaintiff failed to timely disclose Dr. Klein, Plaintiff has not requested any additional time to make expert disclosures.

[6]  It is unclear from the present record whether the written report required by Rule 26(a)(2)(B) is applicable to Dr. Klein.  However, the Court need not answer this question as Plaintiff failed to make any of the other disclosures required by Rule 26 regarding Dr. Klein.

2021, well beyond the expert disclosure deadline.[7]  (Doc. 63; doc. 63-1.)  As such, Defendant did not have the opportunity to depose Dr. Klein, to obtain a rebuttal expert report, or to otherwise conduct discovery in opposition to his opinions prior to filing its Motion for Summary Judgment.

"Under Rule 37(c)(1), a district court clearly has authority to exclude an expert's testimony where a party has failed to comply with Rule 26(a) *unless the failure is substantially justified or is harmless*."  OFS Fitel, LLC v. Epstein, Becker and Green, P.C., 549 F.3d 1344, 1363 (11th Cir. 2008) (emphasis in original).  "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party."  Mitchell v. Ford Motor Co., 318 F. App'x 821, 824 (11th Cir. 2009) (per curiam) (quotations omitted); see also Wilkins v. Montgomery, 751 F.3d 214, 222 (4th Cir. 2014) ("The burden of establishing these factors lies with the nondisclosing party."); Roberts *ex rel*. Johnson v. Galen of Va., Inc., 325 F.3d 776, 782 (6th Cir. 2003) ("We agree with the circuits that have put the burden on the potentially sanctioned party to prove harmlessness."); Wilson v. Bradlees of New England, Inc., 250 F.3d 10, 21 (1st Cir. 2001) ("[I]t is the obligation of the party facing sanctions for belated disclosure to show that its failure to comply with the Rule was either justified or harmless and therefore deserving of some lesser sanction."); Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1107 (9th Cir. 2001) ("Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness."); Heidtman v. Cty. of El Paso, 171 F.3d 1038, 1040 (5th Cir. 1999) (district court did not abuse its discretion in excluding expert testimony when the nondisclosing parties "provided no explanation" for their failure to disclose); Finley v. Marathon Oil Co., 75 F.3d 1225, 1230 (7th

---

[7]  While Plaintiff filed Dr. Klein's affidavit with her Response Brief on January 15, 2021, (doc. 63-1), she did not file Dr. Klein's Expert Report until January 20, 2021, (doc. 65-1, pp. 23–66).  It is unclear whether Plaintiff disclosed this Expert Report to United during the five days between the two filings.

Cir. 1996) ("The sanction of exclusion is thus automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless.").

Here, Plaintiff has provided no explanation for why she failed to comply with the federal rules' disclosure requirements. Indeed, Plaintiff has not responded at all to United's argument that the evidence provided by Dr. Klein should be excluded due to Plaintiff's failure to disclose. Accordingly, the Court excludes all evidence provided by Dr. Klein from the record for purposes of United's Motion for Summary Judgment. Plaintiff points to nothing else in the record to support her Section 1981 claim. The Court thus finds that Plaintiff has failed to create a genuine dispute as to any material fact related to this claim, and United is thus entitled to summary judgment in its favor on Plaintiff's Section 1981 claim. (Doc. 56, pp. 6–7.)

**B.    Even if the Court did Consider Dr. Klein's Evidence, Plaintiff has not Made an Adequate Showing to Support her Section 1981 Claim.**

However, even if the Court were to consider Dr. Klein's affidavit, Plaintiff's Section 1981 claim would still not survive summary judgment. According to Dr. Klein's affidavit, "Mr. Barrett's policy was a type of industrial life insurance . . . policy that is heavily market[ed] to low-income [individuals], particularly African Americans" and, "[g]enerally, industrial life policies are directly linked to, and reliant upon racial discrimination." (Doc. 63-1, p. 1.) Dr. Klein also states that an "[i]ndustrial [l]ife [p]olicy, like the one purchased by Mr. Barrett, [is] typically high in premium costs relative to the actual benefit" and "[t]he marketing and sale of these policies seek to take unfair advantage of consumers who are 'unsophisticated' with respect to their understanding of what they are buying." (Id. at pp. 1–2.) Importantly, Plaintiff's theory of recovery (which she claims is supported by the opinions of Dr. Klein) is not the typical Section 1981 claim. Typically, a plaintiff bringing a Section 1981 claim in this context would assert that the defendant deprived her of the opportunity or ability to contract for, purchase, or own a

particular product or service (i.e., a certain type of life insurance policy).  Here, however, Plaintiff is not asserting that Defendant refused to sell, or interfered with Mr. Barrett's right to buy, any particular type of life insurance policy because of his race.  Instead, Plaintiff asserts essentially the opposite: that United intentionally targeted the sale of this specific type of policy—with high premium costs—to Mr. Barrett and other African Americans.[8]  (Doc. 63, p. 7.)

The United States Court of Appeals for the Eleventh Circuit has suggested—but not definitively held—that marketing a defective product to certain consumers based on race is actionable under Section 1981.  In <u>Roper v. Edwards</u>, white customers inadvertently purchased a defective burial vault that was allegedly intended to be sold to only African American customers. <u>Roper v. Edwards</u>, 815 F.2d 1474, 1476 (11th Cir. 1987).  The white customers brought Section 1981 claims against the supplier and manufacturer of the burial vault, claiming they had been unintentionally injured by the scheme to sell defective vaults to African Americans.  <u>Id.</u>  The Eleventh Circuit ultimately upheld the dismissal of the plaintiffs' claims on other grounds, but it did not reject the cause of action.  <u>Id.</u> at 1477.

The Court is not aware of a case since <u>Roper</u> where the Eleventh Circuit has addressed whether Section 1981 provides a cause of action when a party seeks to sell a defective product to people of a specific race.  However, the United States Court of Appeals for the Third Circuit has addressed this issue and its analysis is instructive.  In <u>Brown v. Philip Morris Inc.</u>, a group of African American plaintiffs brought several claims, including a Section 1981 claim, against several tobacco companies for allegedly targeting the marketing of mentholated cigarettes—which posed a greater health risk than nonmentholated cigarettes—toward African American consumers.

---

[8]  The Court notes that while Plaintiff makes this argument in her Response Brief, she also admitted in her Response to United's Statement of Material Facts that "United has not had a policy or practice of marketing or underwriting life insurance policies based on the race of its customer" since before Mr. Barrett purchased his policy.  (Doc. 64, pp. 2–3.)

Brown v. Philip Morris Inc., 250 F.3d 789, 790 (3d Cir. 2001).  The Third Circuit succinctly noted that "[t]he question at the heart of [plaintiff's Section 1981 claim] is whether such encouragement is unlawful under the civil rights statutes," and it then examined the Eleventh Circuit's opinion in Roper.  Id. at 798.  Ultimately, the Third Circuit reasoned that "if racially directed marketing of menthol cigarettes resulted in a situation in which virtually all mentholated tobacco products were consumed by African-Americans and substantially all non-mentholated tobacco products by others, that case might come within the sweep of Roper.  However, [plaintiffs] have not alleged such a situation."  Id.  Accordingly, the Third Circuit affirmed the district court's holding that the plaintiffs' claims of "racially targeted advertising and marketing of mentholated tobacco products were inadequate to state a cause of action under 42 U.S.C. §[] 1981."  Id. at 806.

Here, even assuming that the insurance policies sold by United could be considered defective products—similar to the burial vault in Roper or the mentholated cigarettes in Brown—the evidence provided by Dr. Klein is not enough to make out a Section 1981 claim under the standard described by the Third Circuit.  First, in his affidavit, Dr. Klein states that Mr. Barrett had a type of "policy that is heavily market[ed] to low-income [individuals], particularly African Americans" and that "[g]enerally, industrial life policies are directly linked to, and reliant upon racial discrimination."  (Doc. 63-1, p. 1.)  Dr. Klein's affidavit makes broad statements about industrial life policies in general and, despite providing no data or analysis concerning United's policies or practices, it leaps to the conclusion that "United engaged in unfair practices in its marketing, sale, and administration of Mr. Barrett's policy."  (Id. at p. 2.)  Notably, however, the affidavit does not include an opinion regarding whether United exclusively marketed its insurance policies with high premiums towards African Americans or that African Americans were by and large the only group who purchased these policies from United.

Unlike the affidavit, Dr. Klein's expert report does offer opinions based on an analytical review of United-specific data. In the report, Dr. Klein explains that he compiled a list of the Zip codes of the owners of the 6,437 United policies in force in Georgia like the one sold to Mr. Barrett,[9] and he "merged [this] data with data from the 1990 Census on the population, racial composition, educational status, and median household income for each Zip code." (Id. at p. 55.) Before discussing his analysis, Dr. Klein explains:

> The objective of this analysis is to examine how the locations of United's policy owners vary with the racial, educational, and income characteristics of these locations. The data provided by United does not include information on the race, education, or income of its policyholders and insureds. Hence, from an empirical perspective, we can only infer the characteristics of United's policy owners and insureds from where they live. For example, if the data indicate that United tends to have more policies in force in areas where African Americans constitute a greater proportion of the population, we can infer that African Americans represent a greater proportion of its customers than people of other races.

(Id. at pp. 55–56.)

Dr. Klein states that his analysis indicated that "the number of policies per 1,000 [persons in a given Zip code] varies directly with the percentage of African Americans in a Zip code, i.e., United has more policies in force per 1,000 persons in high-minority Zip codes than in low-minority Zip codes." (Id. at p. 56.) He then opines that this "reveals a pattern consistent with the literature on the consumers of industrial life insurance. Specifically, African Americans . . . are more likely to purchase industrial life insurance policies." (Id. at p. 62.)

Plaintiff offers no authority for Zip code demographics serving as sufficient evidence to support a Section 1981 claim. However, even if the demographics of Zip codes could stand as a proxy for the demographics of United's customers, the Court is unable to overlook two important

---

[9] Dr. Klein's affidavit states that he "cross referenced the [policy owners'] [Z]ip codes to demographics from 1990 and 2000 Census Bureau data," (doc. 65-1, p. 2), but in his report he indicates that he used only the 1990 Census data, because it was "most appropriate for this analysis as United ha[d] informed [him] that the policies in force were issued primarily during the 1990s," (id. at p. 55).

indications from the data and from Dr. Klein's analysis: first, the data reveals that United sold policies to individuals living in Zip codes with *low* African-American populations; and, second, there is no way to say (nor does Dr. Klein opine) that *all* of the policies sold in any of the Zip codes were sold exclusively to African Americans or even that African Americans were by and large the only group who purchased these policies from United within these Zip codes.  (<u>Id.</u> at pp. 56–59.) Indeed, Dr. Klein states in his report that "if the data indicate that United tends to have more policies in force in areas where African Americans constitute a greater proportion of the population, we can infer that African Americans represent a *greater proportion* of its customers than people of other races."  (<u>Id.</u> at pp. 55–56 (emphasis added).)  He states that his "results [also] indicate that United has significantly more policies in force (in relation to their population) in high-minority Zip codes than in low-minority Zip codes."  (<u>Id.</u> at pp. 58–59.)  However, even assuming these determinations prove that United sells a "greater proportion" or "significantly more" of its policies to African Americans than people of other races, it still does not meet the "virtually all" standard suggested by the Third Circuit.  <u>Philip Morris Inc.</u>, 250 F.3d at 798;  <u>see also</u> <u>Stringer v. Combe, Inc.</u>, No. 17-cv-03192-WHO, 2017 WL 6539779, at *5 (N.D. Cal. Dec. 21, 2017) (dismissing Section 1981 claim because the allegedly defective products "are purchased by and marketed to some extent to other ethnicities" besides African Americans).  Accordingly, the Court finds that, even if the Court were to consider Dr. Klein's affidavit and report, Plaintiff has not created a genuine issue of material fact for her Section 1981 claim to survive summary judgment.

In light of all the foregoing, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's Section 1981 claim.  (Doc. 56.)

## II.      Plaintiff's Fraudulent Inducement and Negligent Misrepresentation Claims

Plaintiff also asserts a fraudulent inducement claim and a negligent misrepresentation claim.  (Doc. 29, pp. 19–20.)  Under Georgia law,[10] "[t]he tort of fraud, including fraudulent inducement, has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." Najarian Cap., LLC v. Clark, 849 S.E.2d 262, 267 (Ga. Ct. App. 2020) (citation omitted).  In addition, "[t]he essential elements of a claim of negligent misrepresentation are: (1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." Trico Env't Servs., Inc. v. Knight Petroleum Co., 849 S.E.2d 538, 543–44 (Ga. Ct. App. 2020) (citation and quotation omitted).  "The same principles apply to both fraud and negligent misrepresentation cases and the only real distinction between negligent misrepresentation and fraud is the absence of the element of knowledge of the falsity of the information disclosed." Bowden v. Med. Ctr., Inc., 845 S.E.2d 555, 564 n.11 (Ga. 2020) (citation and punctuation omitted).  United argues that summary judgment is appropriate as to

---

[10]  In this case, the Court has federal question jurisdiction over Plaintiff's Section 1981 claim and diversity and/or supplemental jurisdiction over Plaintiff's state law claims.  (See, doc. 1, pp. 3–5.)  "Federal courts hearing state law claims under diversity or supplemental jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law." McCoy v. Iberdrola Renewables, Inc., 760 F.3d 674, 684 (7th Cir. 2014). "Georgia continues to apply the traditional choice of law principles of *lex loci delicti*." nVision Global Tech. Sols., Inc. v. Cardinal Health 5, LLC., 887 F. Supp. 2d 1240, 1271 (N.D. Ga. 2012) (internal quotations and citation omitted).  "[T]he rule of *lex loci delicti* [] requires application of the substantive law of the place where the tort or wrong occurred." Carroll Fulmer Logistics Corp. v. Hines, 710 S.E.2d 888, 890 (Ga. Ct. App. 2011), *overruled on other grounds by* Auld v. Forbes, 848 S.E.2d 876, 882 (Ga. 2020).  The parties do not dispute that the events giving rise to this action took place in the state of Georgia.  Moreover, because the parties have only argued Georgia law and have not offered the substantive law of any other state, Georgia law applies.  See Int'l Ins. Co. v. Johns, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989) ("[B]ecause the parties failed to consider the choice of law in this diversity case, we must presume that the substantive law of the forum [] controls.") (citation omitted).

these claims "because there is no evidence that United made a false representation or material omission in the sale of Mr. Barrett's insurance policy." (Doc. 56, pp. 7–8.)

In her Response, Plaintiff argues that "United's failure to disclose to Mr. Barrett that he was purchasing a substandard and overpriced policy, and inducing him to contract himself to pay premiums in excess of the face value of his policy, constituted a fraudulent misrepresentation." (Doc. 63, p. 9.)  Plaintiff goes on to assert that "[h]ad [Mr. Barrett] known that he would be paying well over the face value of the policy, he would not have purchased the policy from United."  (Id.) First, Plaintiff's argument seemingly ignores the Court's September 23, 2019 Order, which dismissed Plaintiff's claims to the extent they were "based solely on the fact that Mr. Barrett paid premiums to United that exceeded the amount of his life insurance policy."[11]  (Doc. 38, p. 27.) Thus, Plaintiff's claims for misrepresentation and fraudulent inducement cannot survive based solely on this theory even to the extent there is sufficient evidence to support it.

The September 23, 2019 Order, however, also held that Plaintiff's allegation, in her Amended Complaint, that a United agent told Mr. Barrett that his policy was "legitimate" could support claims for misrepresentation and fraudulent inducement and, thus, the claims survived to the extent they were based on that assertion.  (Doc. 38, p. 29; see also doc. 29, pp. 19–20.) Assuming the truthfulness of the allegations contained in the Amended Complaint as it was required to do when ruling on the motion to dismiss, the Court explained that this statement could constitute false information upon which Mr. Barrett relied because

> his policy did not disclose that his insurance product and his premium rates were
> less favorable than those offered to Caucasian customers based on his race.  Thus,
> Mr. Barrett could not have discovered that United agents were lying to him when

---

[11]  In arguing that Mr. Barrett paid more in premiums than the face amount of his policy, Plaintiff states that he "made approximately 396 payments of $36.35 in the 33 years [1984-2017] he held the policy, resulting in the sum of $14,394.60."  (Doc. 63, p. 4 n.2 (brackets in original).)  It is clear that the policy required a monthly payment of $36.35.  (Doc. 29-2, p. 5.)  However, Plaintiff points to no evidence in the record that Mr. Barrett paid $14,394.60 to United.

> they told him that his policy was legitimate (put another way, lawful) and he could
> not have discovered United's scheme to hide the discrimination underlying his
> insurance policy from him.

(Doc. 38, p. 30.)

However, now—at the more strenuous summary judgment stage—Plaintiff has failed to

support these allegations with evidence from the record.  First, Plaintiff admits that she "never

heard anyone represent to Mr. Barrett that his policy was a 'legitimate' whole life policy," (doc.

64, pp. 8–9), and she offers no other evidence that a United agent made this statement.  Thus,

Plaintiff has pointed to no evidence from which the jury could conclude that a United agent told

Mr. Barrett that his policy was "legitimate."  Second, and perhaps more importantly, Plaintiff

points to nothing in the record showing that United actually engaged in racial discrimination when

it sold Mr. Barrett his policy.  Specifically, Plaintiff provides no evidence that, at the time Mr.

Barrett purchased his policy, United was selling insurance policies with more favorable rates only

to customers who were not African American.  Without these showings, Plaintiff has failed to

create a material issue of disputed fact as to whether United told Mr. Barrett that his policy was

"legitimate" and whether it thereby provided Mr. Barrett with false information (or Mr. Barrett

reasonably relied on false information provided by United).[12]  See Resol. Tr. Corp. v. Dunmar

---

[12] Dr. Klein's affidavit states that "United engaged in unfair practices in its marketing, sale, and
administration of Mr. Barrett's policy."  (Doc. 63, p. 2.)  As previously discussed, the Court will not
consider Dr. Klein's affidavit and expert report.  (See Discussion Section II, supra.)  In addition, even if it
did consider his opinions, this conclusory statement is insufficient to create a dispute of fact sufficient to
enable the misrepresentation and fraudulent inducement claims to survive summary judgment.  See Evers
v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("[A] party may not avoid summary judgment
solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its
conclusory allegations."); Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1228 (11th Cir. 1999)
("However, the absence of any specific facts which would substantiate Dr. Budlong's conclusion deprives
this medical diagnosis of any probative value.").  Dr. Klein's expert report states that "the marketing and
sale of these policies seek to take unfair advantage of consumers who are 'unsophisticated' with respect to
their understanding of what they are buying and other options."  (Doc. 65-1, p. 63.)  Dr. Klein, however,
does not provide any specific details about United's marketing and sale of the at-issue policies.  In a
different part of the report, he states that "[i]n [his] opinion, the agents that sell industrial life insurance are

Corp., 43 F.3d 587, 592 (11th Cir. 1995) ("In opposing a motion for summary judgment, 'a party may not rely on his pleadings to avoid judgment against him.'") (quoting Ryan v. Int'l Union of Operating Eng'rs, Local 675, 794 F.2d 641, 643 (11th Cir. 1986)).  As such, both the fraudulent inducement and the negligent misrepresentation claims fail.  Thus, the Court **GRANTS** United's Motion for Summary Judgment as to Plaintiff's fraudulent inducement and negligent misrepresentation claims.  (Doc. 56, pp. 10–11.)

### III.    Plaintiff's Claim for Money Had and Received

Plaintiff also brings a claim for money had and received.  (Doc. 29, pp. 16–17.)  Under Georgia law, "[a]n action for money had and received is founded upon the equitable principle that no one ought to unjustly enrich himself at the expense of another, and is maintainable . . . where one has received money under such circumstances that in equity and good conscience he ought not to retain it."  Sentinel Offender SVCS., LLC v. Glover, 766 S.E.2d 456, 471 (Ga. 2014).  Under this cause of action, a plaintiff normally may reclaim "a payment mistakenly made when that mistake was caused by his lack of diligence or his negligence in ascertaining the true facts and the other party would not be prejudiced by refunding the payment—subject to a weighing of the equities between the parties by the trier of fact."  Gulf Life Ins. Co. v. Folsom, 349 S.E.2d 368, 406 (Ga. 1986).  Importantly, "[t]his theory applies only when there is no actual legal contract."  Baghdady v. Cent. Life Ins. Co., 480 S.E.2d 221, 224 (Ga. Ct. App. 1996).

In its September 23, 2019 Order on United's Motion to Dismiss, the Court allowed Plaintiff's money had and received claim to proceed because "the parties [had] not addressed

---

more committed to the interests of the insurers they represent than the best interests of their customers" and that "these agents are more inclined to sell substandard products that are a poor value for many of their customers." (Id. at p. 35.)  However, Dr. Klein does not provide any specific facts showing that United or its agents took part in these practices much less that United made any false statements to Mr. Barrett. Accordingly, summary judgment on Plaintiff's fraudulent inducement and negligent misrepresentation claims is still warranted.

whether [the alleged] fraud and discrimination underlying the parties' transaction would void the contract between United and Mr. Barrett, much less cited applicable authority on that question." (Doc. 38, p. 28.)   Now, United argues that because Plaintiff has failed to provide evidence of discrimination or fraud, she cannot show that "the contract between United and Mr. Barrett is void" and her money had and received claim is not viable.  (Doc. 56, p. 9.)  Plaintiff responds by arguing that "Defendant['s] fraud and racial discrimination constitutes the very type of behavior which would ordinarily give rise to the quasi-equitable form of relief available under claims for money had and received." (Doc. 63, pp. 10–11.)  However, as the Court has already explained, Plaintiff has not pointed to any evidence that United treated Mr. Barrett differently than non-African American customers in violation of Section 1981 or that United committed fraud.  Thus, Plaintiff is unable to show that the insurance policy is void.  The policy is clear that its face amount was $5,000 and that its monthly premiums were $36.35.  (Doc. 29-2, p. 5.)  Mr. Barrett agreed to these terms, and Plaintiff cannot now "resort to the theory of money had and received to alter the terms of [this] contract."  McGonigal v. McGonigal, 669 S.E.2d 446, 447 (Ga. Ct. App. 2008).  For these reasons, the Court **GRANTS** Plaintiff's Motion for Summary Judgment as to Plaintiff's money had and received claim.  (Doc. 56, pp. 10–11.)

## IV.    Statutes of Limitations

United also argues that summary judgment is appropriate on all of Plaintiff's claims on the alternative ground that they "are barred by the applicable statute of limitations, and Plaintiff has failed to create a genuine dispute of fact that the limitations period was tolled by fraudulent concealment." (Doc. 56, p. 11.)  Plaintiff does not appear to dispute that the statute of limitations for each of her claims would have ordinarily run before the commencement of this suit.  (Doc. 63, p. 12; see also doc. 29, pp. 10–11.)  However, she argues that "[t]he record contains sufficient

evidence from which a reasonable jury could conclude that she can establish each element of fraudulent concealment" and that United's fraudulent concealment tolls the applicable statutes of limitations. (Doc. 63, p. 12.)

Under Georgia law, "if the defendant is 'guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud.'"[13] Hewitt Assocs., LLC v. Rollins, Inc., 708 S.E.2d 697, 701 (Ga. Ct. App. 2011) (quoting O.C.G.A. § 9–3–96.).

> [T]o establish fraudulent concealment under this statute sufficient to toll the statute of limitation, a plaintiff must prove that: (1) the defendant committed actual fraud involving moral turpitude, (2) the fraud concealed the cause of action from the plaintiff, and (3) the plaintiff exercised reasonable diligence to discover his cause of action despite his failure to do so within the applicable statute of limitation.

Smith v. Suntrust Bank, 754 S.E.2d 117, 123 (Ga. Ct. App. 2014) (quoting Cochran Mill Assocs. v. Stephens, 648 S.E.2d 764, 768 (Ga. Ct. App. 2007)). Importantly, in Georgia, the rule of fraudulent concealment "is applied even where actual fraud is the gravamen of the action." Anthony v. Am. Gen. Fin. Servs., Inc., 697 S.E.2d 166, 176 (Ga. 2010) (quoting Bahadori v. Nat'l Union Fire Ins. Co., 507 S.E.2d 467, 470 (Ga. 1998)). "Where the basis of an action is actual fraud, the mere silence of the party committing it is treated as a continuation of the original fraud and as constituting a fraudulent concealment, and the statute of limitations does not begin to run against such right of action until such fraud is discovered, or could have been discovered by the exercise of ordinary care and diligence." Shipman v. Horizon Corp., 267 S.E.2d 244, 246 (Ga. 1980) (citation and quotation omitted).

---

[13] In its September 23, 2019 Order, the Court analyzed which law should apply to the parties' tolling by fraudulent concealment arguments and determined that Georgia law applied to all of Plaintiff's claims. (Doc. 38, pp. 14–18.) Neither party questions that determination in their briefs or provides any authority suggesting that the Court should reconsider its conclusion. Accordingly, the Court will continue to apply Georgia law to the fraudulent concealment issue.

Case 4:17-cv-00215-RSB-CLR   Document 76   Filed 06/03/21   Page 23 of 25

As the Court has already explained, Plaintiff has failed to provide any evidence that United committed fraud when it sold Mr. Barrett his policy. Because Plaintiff is unable to even create a genuine dispute of material fact as to the "actual fraud [which she claims] is the gravamen of [her] action[,]" the doctrine of fraudulent concealment cannot toll the statute of limitation for her claims. Rai v. Reid, 751 S.E.2d 821, 823 (Ga. 2013). Mr. Barrett purchased his policy from United in 1984. (Doc. 64, p. 3.) The longest statute of limitations period for any of Plaintiff's claims is four years. See Dewrell Sacks, LLP v. Chicago Title Ins. Co., 749 S.E.2d 802, 807 (Ga. Ct. App. 2013) ("[T]he four-year statute of limitation set forth in O.C.G.A § 9–3–25 applied to its counterclaims for . . . Money Had and Received."); Mbigi v. Wells Fargo Home Mortg., 785 S.E.2d 8, 18 (Ga. Ct. App. 2016) ("A four-year statute of limitation applies to actions for fraud and negligent misrepresentation."); Kaylor v. Rome City Sch. Dist., 600 S.E.2d 723, 726 (Ga. Ct. App. 2004) ("A fraudulent inducement claim is governed by O.C.G.A § 9–3–31, which imposes a four-year statute of limitation."). (See also doc. 38, p. 17 ("Georgia's two-year statute of limitations for personal injury torts …appl[ies] to Plaintiff's Section 1981 claims.")). Because Plaintiff is unable to provide any evidence of fraudulent concealment by United, her claims are time barred. Accordingly, the Court **GRANTS** United's Motion for Summary Judgment on this alternative ground. (Doc. 56, pp. 11–13.)

## V.     Punitive Damages

Plaintiff also seeks punitive damages. (Doc. 29, pp. 20–21.) Any award of punitive damages under Section 1981 requires a showing by the plaintiff that the defendant "acted with actual malice or reckless indifference [towards the plaintiff's] federally protected rights." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1280 (11th Cir. 2002) (citing Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536–37 (1999)). Under Georgia law, "punitive damages may be awarded in

tort actions 'in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.'" Avery v. Schneider ex rel. Schneider, 849 S.E.2d 1, 11 (Ga Ct. App. 2020) (quoting O.C.G.A. § 51–12–5.1(b)).[14]   For the reasons discussed above, Plaintiff's Section 1981, fraudulent inducement, and money had and received claims fail as a matter of law.   Thus, Plaintiff cannot show that United acted with the requisite intent required under either federal or Georgia law and therefore cannot show she is entitled to punitive damages.   Accordingly, the Court **GRANTS** United's Motion for Summary Judgment on this claim.   (Doc. 56.)

## VI.    Class Certification

The Court now turns to Plaintiff's Motion for Class Certification.   (Doc. 65.)   As previously explained, "it is 'within the court's discretion to consider the merits of [Plaintiff's] claims before [considering] their amenability to class certification.'" Kehoe v. Fid. Fed. Bank & Tr., 421 F.3d 1209, 1211 n.1 (11th Cir. 2005) (quoting Telfair v. First Union Mortg. Corp., 216 F.3d 1333, 1343 (11th Cir. 2000)).   Because the Court finds that Plaintiff has put forth insufficient evidence to support any of her substantive claims, no claims remain for the Court to consider whether class certification is appropriate.   See Telfair, 216 F.3d at 1343 ("After determining that none of [plaintiff's] underlying claims had merit, the . . . court came to the ineluctable conclusion that there were no claims to certify as a class action lawsuit.").   Thus, the Court **DENIES AS MOOT** Plaintiff's Motion for Class Certification.   (Doc. 65.)

---

[14] A negligent misrepresentation claim cannot support a claim for punitive damages.   See Boeing Co. v. Blane Int'l Grp., 624 S.E.2d 227, 231 (Ga. Ct. App. 2005) ("[Plaintiff] contends the jury's award for negligent misrepresentation supports the award for punitive damages.   However, negligence, even including gross negligence, is insufficient to support a claim for punitive damages.").

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant United Insurance Company of America's Motion for Summary Judgment. (Doc. 56.) The Court therefore **DENIES AS MOOT** Plaintiff Minerva Barrett's Motion for Class Certification. (Doc. 65.) The Court **DIRECTS** the Clerk of Court to enter summary judgment in favor of Defendant and to **CLOSE** this case.

**SO ORDERED**, this 3rd day of June, 2021.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA